

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0433-14

### THE STATE OF TEXAS

### v.

### HAYDEN HUSE, Appellee

### ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### LUBBOCK COUNTY

YEARY, J., delivered the opinion of the Court in which KELLER, P.J. and MEYERS, KEASLER, HERVEY, ALCALA and RICHARDSON, JJ., joined. NEWELL, J., concurred in the result. JOHNSON, J., dissented.

### O P I N I O N

In this prosecution for the misdemeanor offense of driving while intoxicated, the State obtained evidence of Appellee's blood-alcohol concentration by issuing a grand jury subpoena for his hospital medical records. The trial court granted Appellee's motion to suppress on two grounds relevant to Appellee's current petition for discretionary review: 1) that obtaining Appellee's medical records without a warrant violated the Fourth Amendment,

necessitating suppression under both the federal exclusionary rule and Article 38.23 of the Texas Code of Criminal Procedure; and 2) that a misuse of the grand jury subpoena process caused the State's acquisition of Appellee's medical records to violate both state and federal law, also requiring suppression of the evidence under our state exclusionary rule, Article 38.23. U.S. CONST. amend. IV; TEX. CODE CRIM. PROC. art. 38.23. The State appealed. TEX. CODE CRIM. PROC. art. 44.01(a)(5).

In an unpublished opinion, the Seventh Court of Appeals reversed the trial court's order suppressing the evidence. *State v. Huse*, No. 07-12-00383-CR, 2014 WL 931265 (Tex. App.—Amarillo Mar. 6, 2014) (mem. op., not designated for publication). The court of appeals held that the trial court erred in that, respectively: 1) under this Court's opinion in *State v. Hardy*, 963 S.W.2d 516 (Tex. Crim. App. 1997), Appellee lacked standing to raise a Fourth Amendment challenge to the State's acquisition of his medical records; and 2) the State did not acquire Appellee's medical records through an unlawful grand jury subpoena, so it was not necessary to suppress them under Article 38.23. *Huse*, 2014 WL 931265, at *4-6.

We granted Appellee's petition for discretionary review to address two issues. First, does the advent of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")[1] materially impact this Court's holding in *Hardy* with respect to Fourth

---

[1] As the Fourteenth Court of Appeals has noted elsewhere:

On August 21, 1996, Congress enacted HIPAA to "improve portability and continuity of health care coverage in the group and individual markets, to combat

Amendment standing to complain of the State's acquisition of specific medical records? And second, did the State acquire Appellee's medical records by way of a grand jury subpoena process that violated either HIPAA or state law, thus necessitating that they be suppressed under Article 38.23? We ultimately answer both questions "no." Accordingly, we will affirm the judgment of the court of appeals.

## I. BACKGROUND

### The Facts

The facts of the case were largely stipulated to by the parties in the trial court and are not in serious dispute. They show the following time-line:

- On February 13, 2010, at approximately 2:00 o'clock in the morning, Appellee missed a curve and plowed his car into a cotton field.

- Lubbock County Deputy Sheriffs who responded to the scene detected the odor of alcohol on Appellee's breath. They transported him to the Covenant Medical Center in Lubbock.

- Appellee's blood was drawn for medical purposes at 4:50 a.m. Later analysis of his blood revealed a blood alcohol concentration of .219.

---

waste, fraud, and abuse in health care and health care delivery." Pub.L. No. 104-191, 110 Stat. 1936 (1996). Congress also instructed the Secretary of Health and Human Services to promulgate "final regulations" containing "standards with respect to the privacy of individually identifiable health information" should Congress fail to enact such privacy standards within 36 months of the HIPAA enactment. 110 Stat. 2033-34. * * * On February 13, 2001, the Secretary promulgated final regulations that restrict and define the ability of covered entities, *i.e.*, health plans, health care clearinghouses, and health care providers, to divulge patient medical records.

*Tapp v. State*, 108 S.W.3d 459, 462-63 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd.). It is to those regulations that we refer in the remainder of this opinion.

- Department of Public Safety Trooper Troy McKee met with Appellee at the hospital at approximately 5:15 a.m. He also noticed the odor of alcohol on Appellee's breath as well as other signs of alcohol ingestion. Appellee admitted to having had six or seven beers between 7:30 and 11:30 the previous evening. Appellee refused McKee's request for a specimen of breath or blood for blood alcohol analysis, and McKee did not attempt to compel one.

- On March 30, 2010, based on McKee's offense report, a Lubbock County Assistant District Attorney filed an application for a grand jury subpoena *duces tecum* to obtain Appellee's medical records for the February 13th incident. The subpoena issued by the District Clerk to Covenant Medical Center required an employee of the hospital to appear before the grand jury but stated that the hospital could comply by simply calling the District Attorney's office, presumably to arrange delivery of Appellee's medical records from that day to the Assistant District Attorney. No grand jury was actively investigating Appellee. Neither was any grand jury involved in the issuance of the subpoena, nor were the medical records required to be, nor ever actually were, returned to a grand jury.

- On March 31, 2010, the day after the subpoena *duces tecum* issued, Appellee was formally charged by information with the misdemeanor offense of driving while intoxicated.

- On April 15, 2010, Covenant Medical Center complied with the subpoena *duces tecum*, providing Appellee's medical records from February 13th to the District Attorney's office, along with a business record affidavit.

- On March 14, 2011, almost a year later, Appellee amended an earlier-filed motion to suppress to argue for the first time that his medical records should be suppressed as the product of a grand jury subpoena that violated both state law and HIPAA. No hearing was immediately conducted on Appellee's motion to suppress.

- On September 27, 2011, while Appellee's motion to suppress was still pending, the State moved to dismiss the information against Appellee, which was granted.

- On October 5, 2011, a new grand jury subpoena *duces tecum* issued, this time on the basis of an application that was actually signed by the foreman of the grand jury. But, as before, the subpoena issued by the District Clerk to Covenant Medical Center stated that the hospital could comply by simply contacting the District Attorney's office, to arrange delivery of Appellee's medical records to the Assistant District Attorney. It is unclear whether the medical records were ever actually returned to a grand jury. But no grand jury ever issued an indictment against Appellee.

- On October 6, 2011, the next day, Appellee was once again charged by information with driving while intoxicated on February 13, 2010. Appellee's pre-trial motions were carried over to the new information.

- On October 11, 2011, Covenant Medical Center complied with the second grand jury subpoena by supplying the same medical records directly to the Assistant District Attorney with a second business record affidavit.

- On January 25, 2012, the trial court conducted a hearing on Appellee's motion to suppress. As summarized by the court of appeals, "[i]n addition to testimony of Trooper McKee, the facts surrounding the subpoena process and the obtaining of the medical records were stipulated to between the State and Appellee, leaving only the issue of whether Appellee's medical records were illegally obtained and, therefore, excludable." 2014 WL 931265, at *2.

- On August 6, 2012, the trial court granted Appellee's motion to suppress.

- On November 30, 2012, the trial court filed written findings of fact and conclusions of law in support of its grant of Appellee's motion to suppress.

### The Trial Court's Findings and Conclusions

After setting out the above uncontested facts, the trial court prefaced its formal conclusions of law with a "discussion," which included the following observations: "Because

the State failed to establish that an actual grand jury investigation existed or that other legislative authority or a warrant authorized its actions, the State's use of the grand jury subpoena(s) appears to be an illegitimate exercise of authority. It is this court's opinion, that the use of a grand jury subpoenas [sic] for purposes wholly unrelated to actual grand jury investigations is inappropriate." It is not altogether clear from these observations whether the trial court concluded that *both* the March 30th grand jury subpoena *and* the October 5th grand jury subpoena were unlawful, or *just* the March 30th grand jury subpoena. The trial court's formal conclusions of law do not entirely resolve this ambiguity. They read, almost in their entirety, as follows:

1)      Defendant has standing to present his Motion to Suppress, including, but not limited to, challenging the process by which the State seized the medical records. This case is distinguishable from *Hardy* in at least two significant ways: first, *Hardy* was decided before HIPAA compliance was mandated; second, the subpoenas in this case seek *any and all medical records* and are not limited to merely blood tests.

2)      HIPAA legislatively creates an expectation of privacy in medical information in the custody of a covered health care provider.

3)      A general demand by the State for "any and all" medical records infringes upon protected privacy interests, even apart from HIPAA.

4)      HIPAA provides means by which the State may lawfully obtain medical records.

5)      The State obtained Mr. Huse's health information from a covered healthcare prov[id]er based upon a grand jury subpoena.

6)      The 3/30/10 grand jury subpoena issued by the State was defective because it did not meet legislative requirements because no actual grand jury was involved with that subpoena. Therefore, the 3/30/10

subpoena was insufficient to satisfy HIPAA's grand jury subpoena exception.

7) The medical records obtained pursuant to the 3/30/10 subpoena were in violation of HIPAA.

8) The 10/05/11 grand jury subpoena does not cure the 3/30/10 subpoena's HIPAA violation.

9) The State failed to demonstrate any attenuation of the taint.

10) The State did not acquire the records via a warrant and no exception to the warrant requirement has been established.

11) Article 38.23 applies because the State did not comply with federal and/or state law when obtaining Huse's medical information.

12) This case presents no exigent circumstances. There is little danger that the evidence would be destroyed or that a delay in obtaining a search warrant would have jeopardized the investigation. Medical records, unlike alcohol in one's blood, do not dissipate over time.

13) The grand jury subpoenas were used to seize Huse's protected medical records for law enforcement purposes rather than to bring a witness or evidence before a grand jury for grand jury purposes. Such an action is not authorized by the grand jury subpoena statute and is, therefore, unlawful.[2]

14) The doctrine of inevitable discovery is not available under Texas law; thus, the medical records that were originally obtained in an unlawful manner must be suppressed from evidence in the current DWI case against Defendant, even if the Court finds that they were subsequently

---

[2] This conclusion of law, couched as it is in the plural form (*i.e.*, "subpoena*s*"), would seem to constitute a ruling that *both* grand jury subpoenas were "unlawful." On the other hand, Conclusion Numbers 6 and 7, *ante*, only seem to hold the first grand jury subpoena to be expressly unlawful, and Conclusion Numbers 8 and 9 then address whether the taint attendant to the unlawfulness of the first grand jury subpoena operates also to invalidate the second. Such an inquiry would seem to be beside the point if the second grand jury subpoena were itself unlawful. Thus, the ambiguity persists.

obtained in a lawful manner.[3]

Thus, the trial court apparently ruled that Appellee's medical records were subject to suppression both 1) under the Fourth Amendment exclusionary rule, because in the absence of a valid grand jury subpoena, a warrant was required, and also 2) under Article 38.23 of the Code of Criminal Procedure, because the grand jury subpoena process was unlawfully invoked. In separate points of error on appeal, the State challenged these conclusions. *See* TEX. CODE CRIM. PROC. art. 44.01(5) (permitting the State to appeal the granting of a motion to suppress evidence).

**The Court of Appeals Opinion**

The court of appeals sustained both of the State's arguments. First, the court of appeals rejected the trial court's conclusion that Appellee had standing to raise the Fourth Amendment issue. Relying upon its own earlier opinion in *Kennemur v. State*, 280 S.W.3d 305, 311-12 (Tex. App.—Amarillo 2008, pet. ref'd), the court of appeals held that HIPAA did not affect *Hardy*'s narrow holding that "whatever interests society may have in safeguarding the privacy of medical records [in general], they are not sufficiently strong [as] to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident." *Huse*, 2014 WL 931265, at \*4-5; *see Hardy*, 963 S.W.2d at 527. The court of appeals noted that, in fact, HIPAA expressly

---

[3] A fifteenth (and final) conclusion of law pertained to an issue that is not before us in this petition for discretionary review. Although the court of appeals reached the issue, Appellee does not complain of its disposition in his petition, and we need not address it.

recognizes that such records may be subject to disclosure by hospital personnel if they suspect the commission of a crime while providing emergency care. *Huse*, 2014 WL 931265, at * 5 (quoting *Kennemur*, 280 S.W.3d at 312, which in turn quotes 45 C.F.R. § 164.512(f)(6)(I), expressly allowing a health care provider to disclose otherwise protected emergency health care information to law enforcement when to do so "appears necessary" to report a crime). On the strength of the continuing viability of our holding in *Hardy*, the court of appeals held that Appellee lacked a legitimate expectation of privacy in his blood-alcohol test records to justify mounting a Fourth Amendment challenge. *Id*.

Addressing the second issue, the court of appeals began its analysis with the questionable premise that "the trial court made no finding in its *Conclusions of Law* that the second grand jury subpoena was defective." *Id*. at *6.[4] Noting that the second grand jury subpoena application was signed by the grand jury foreman, the court of appeals concluded that it was therefore lawful under HIPAA, which also expressly provides for the disclosure of medical records pursuant to a grand jury subpoena. *Id*. (citing 45 C.F.R. § 164.512(f)(1)(ii) (B)). The court of appeals was satisfied that the grand jury foreman's signature was enough to satisfy HIPAA's grand jury subpoena provision. *Id.* Because Appellee's medical records were obtained pursuant to the second, valid grand jury subpoena, the court of appeals reasoned, and because "Appellee failed to establish any causal connection between issuance of the first and second subpoenas," the records were not "obtained" in violation of HIPAA.

---

[4] As we have already indicated, it is not nearly as clear to us as it was to the court of appeals that the trial court drew no such conclusion. *See* note 2, *ante*.

*Id*. Accordingly, the court of appeals concluded, the trial court erred to apply Article 38.23 to suppress them. *Id*. We granted Appellee's petition to examine each of these discrete holdings.

## II. FOURTH AMENDMENT STANDING

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV. This provision "protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). But for that very reason, the right is a personal one that cannot be invoked vicariously on behalf of another. "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978). As we observed in *Chapa v. State*, 729 S.W.2d 723, 727 (Tex. Crim. App. 1987), "[i]n *Rakas v. Illinois*, the substantive question of what constitutes a 'search' for purposes of the Fourth Amendment was effectively merged with what had been a procedural question of 'standing' to challenge such a search."

Moreover, what constitutes a "search" for Fourth Amendment purposes—and hence, what may serve to confer Fourth Amendment "standing" consistent with *Rakas*—may be predicated, the Supreme Court has recently emphasized, on either an intrusion-upon-property principle or a reasonable-expectation-of-privacy principle. *United States v. Jones*, 132 S.Ct.

945 (2012); *Florida v. Jardines*, 133 S.Ct. 1409 (2013); *see also Ford v. State*, 477 S.W.3d 321, 328 (Tex. Crim. App. 2015) ("A Fourth Amendment claim may be based on a trespass theory of search (one's own personal 'effects' have been trespassed), or a privacy theory of search (one's own expectation of privacy was breached)."). Appellee has not argued, either in the court of appeals or in this Court, that he maintains a property interest in his medical records,[5] nor did the court of appeals address such a theory of standing. We therefore limit our consideration to the propriety of the court of appeals's holding that Appellee lacked a reasonable expectation of privacy in his medical records, at least insofar as they reflected the results of the blood alcohol test results.[6] More particularly, we will review the court of appeals's conclusion that *Hardy*'s holding in this regard remains unaffected by the subsequent enactment of HIPAA.

### *Hardy*

---

[5] This Court has held that, when it comes to legal representation, "[t]he client's file belongs to the client[,]" not his attorney. *In re McCann*, 422 S.W.3d 701, 704 (Tex. Crim. App. 2013). Appellee has made no analogous argument that, similarly, a patient's medical records "belong to" the patient, such that he has Fourth Amendment standing on *that* basis to complain of the State's warrantless acquisition of them. In the absence of briefing on that issue, we will not address it *sua sponte* on discretionary review.

[6] The trial court suppressed all of the medical records from Appellee's treatment at the Covenant Medical Center from February 13, 2010—all 74 pages of them—and not just that portion of the medical records reporting the results of the blood-alcohol analysis. On appeal, the State seems to have contended only that the trial court erred to suppress the results of the blood alcohol analysis, arguing that to suppress at least that portion of the medical records was inconsistent with this Court's narrow holding in *Hardy*. The State does not seem to contend that the trial court erred to suppress the balance of the medical records, and so, as in *Hardy* itself, we need not reach that question. Because our holding reaches only the question of whether the blood alcohol analysis should have been suppressed, the trial court's purported distinction between this case and *Hardy*, expressed in its first conclusion of law, *see* page 6, *ante*, is moot.

In *Hardy*, we explicitly recognized that, when the State itself extracts blood from a DWI suspect, and when it is the State that conducts the subsequent blood alcohol analysis, two discrete "searches" have occurred for Fourth Amendment purposes. 963 S.W.2d at 523-24. Here, as in *Hardy*, the State neither extracted Appellee's blood nor instigated the blood alcohol analysis, and "the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on [its] own initiative," such as the one that the hospital conducted in the context of treating Appellee. *Skinner v. Railway Labor Exec. Assn.*, 489 U.S. 602, 614 (1989). So Appellee has no standing to (and does not now) complain of either the blood extraction or the blood alcohol analysis themselves. He argues only that the State's acquisition of the medical records—that reflect the *result* of those *private* intrusions (the extraction of blood and the blood alcohol analysis)—*itself* constitutes a discrete governmental search to which Fourth Amendment protections extend. To answer that question in *Hardy*, we inquired whether society recognizes as reasonable any expectation of privacy, not in medical records as a general rule, but in that subset of privately generated and maintained medical records that would show the result of a blood alcohol analysis in an individual that the State suspects of driving while intoxicated. 963 S.W.2d at 525-27. We concluded that the answer to this narrower question is "no."

Analogizing to *United States v. Jacobsen*, 466 U.S. 109 (1984), we pointed out that Hardy's expectation of privacy had already been frustrated to a certain extent by the fact that a private party had already extracted and analyzed his blood. In *Jacobsen*, we explained,

employees of a private freight company had already opened a package and, upon discovering a white powdery substance, notified federal agents. *Hardy*, 963 S.W.2d at 526. The only additional search conducted by the government itself was to test the privately exposed substance for the presence of contraband. *Id*. But, since the test was designed to reveal nothing about the substance *except* whether it was contraband, and an individual can have no reasonable expectation of privacy in the possession of contraband, the analysis of the substance was not regarded as a "search" for Fourth Amendment purposes. *Id*. We went on to compare the chemical analysis of the white powdery substance in *Jacobsen* to the acquisition of medical records in *Hardy*:

> A subpoena for blood alcohol and drug information about the driver in an automobile accident is somewhat analogous to the chemical test in *Jacobsen*. A subpoena directed solely at blood alcohol and drug tests would, like the chemical test in *Jacobsen*, be a very narrow investigatory method designed to elicit evidence for a very narrow purpose.

*Id*. This very narrow purpose was one, we found, that society as a whole was more than willing to endorse as a legitimate justification for invading the privacy of DWI suspects, as evidenced by the universality of implied consent statutes across the country that compel the extraction and analysis of their breath or blood for chemical analysis. *Id*. at 526-27. Indeed, we noted, obtaining medical records of privately conducted blood extraction and analysis is much less invasive than either the extraction or the chemical analysis themselves. *Id*. at 527. In light of these considerations, we concluded that, "whatever interests society may have in safeguarding the privacy of medical records [in general], they are not sufficiently strong to

require protection of blood-alcohol test results taken by hospital personnel solely for medical purposes after a traffic accident." *Id*.

## HIPAA

Does HIPAA now undercut the Court's analysis in *Hardy*? The court of appeals concluded that it did not, and we agree. We have no doubt that HIPAA might support a broader claim that society now recognizes (if it did not already) that a patient has a legitimate expectation of privacy in his medical records *in general*. Indeed, we recognized in *Hardy* that there was already a suggestion in our case law, even before the advent of HIPAA, that such a reasonable expectation might exist, both in dicta, in *Richardson v. State*, 865 S.W.2d 944, 952-53 & n.7 (Tex. Crim. App. 1993), and in a plurality opinion, *State v. Comeaux*, 818 S.W.2d 46 (Tex. Crim. App. 1991) (plurality opinion). *Hardy*, 963 S.W.2d at 518-19; *see also Ford*, 477 S.W.3d at 334 (acknowledging that there might be contexts in which there is "a jurisprudential reason to stray from the third-party doctrine" by which a defendant is deemed to lack a reasonable expectation of privacy in otherwise personal information that is disclosed to a cell-phone service provider and contained in that provider's records). But that broader issue is not before us here—just as it was not before us in *Hardy*.[7]

With respect to the narrower issue that we actually *did* decide in *Hardy*, HIPAA actually serves to bolster our holding. While codifying a broad requirement of patient

---

[7] We acknowledged both *Richardson* and *Comeaux* in *Hardy*, but observed that "the existence of a reasonable expectation of privacy in physician-patient communications, generally, does not necessarily mean that medical records would carry an expectation of privacy in every situation." 963 S.W.2d at 519.

confidentiality in medical records, HIPAA nonetheless provides specific exceptions in which the disclosure of otherwise protected health care information is permitted. Section 164.512(f)(1)(ii)(B) of Title 45 of the Code of Federal Regulations, for example, allows for the disclosure of "protected health information" when to do so is "[i]n compliance with and as limited by the relevant requirements of . . . [a] grand jury subpoena[.]"[8] Under this provision, a DWI offender would have no legitimate expectation of privacy sufficient to block a health care provider from disclosing otherwise protected health care information when required to do so under the terms of a grand jury subpoena. *Hardy* itself involved the disclosure of medical records, including the results of blood alcohol testing, that the State obtained pursuant to a grand jury subpoena. 963 S.W.2d at 518. Assuming that such disclosures occur under circumstances sufficient to meet the conditions prescribed, whatever insulation HIPAA provides against third-party disclosure of medical records *in general* does not extend to the disclosure of "blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident."[9] *Hardy*, 963 S.W.2d at 527.

---

[8] Under the rubric of "Standard: Disclosure for law enforcement purposes[,]" 45 C.F.R. § 164.512(f)(1)(ii)(B) permits the "disclosure [of] protected health information" when it is "[i]n compliance with and as limited by the relevant requirements of . . . [a] grand jury subpoena[.]"

[9] We are not at this juncture concerned with the question of whether the conditions under which 45 C.F.R. § 164.512(f)(1)(ii)(B) would permit disclosure were actually satisfied in this case. That is the province of our discussion of Appellee's second ground for review, whether the specific provisions of HIPAA, or any provision of state law that governs grand jury subpoenas, may have been violated so as to trigger Article 38.23's statutory exclusionary rule. *See* TEX. CRIM. PROC. art. 38.23(a) ("No evidence obtained by an officer . . . in violation of any provisions of the . . . laws of the State of Texas, . . . or laws of the United States of America, shall be admitted in evidence against an accused on the trial of any criminal case."). Here we mean only to point out that the existence of this exception to HIPAA's general rule against disclosure of medical information only serves to

The court of appeals did not err to conclude that *Hardy*'s narrow holding remains valid with respect to Fourth Amendment standing, even in light of the subsequently enacted provisions of HIPAA.

Finally, Appellee points to a particular provision in HIPAA mandating that, in the event of a conflict between provisions of state law and the limitations on disclosure of medical information contained in HIPAA itself, it is the federal law that must prevail over the state law unless the state law is more protective of an individual's privacy interests. 45 C.F.R. § 160.203(b).[10] From this, Appellee seems to argue that we must abandon our holding in *Hardy* because it represents state common law that is less protective than—and therefore preempted by—this preemption provision in HIPAA. Our response to this contention is two-fold. First, *Hardy*'s resolution of the issue of Fourth Amendment standing was a holding of federal constitutional dimension, not a state-law ruling. We therefore perceive no conflict between state law and HIPAA that must be resolved in favor of the latter. Second, and in any event, even assuming that *Hardy* represented a holding of state-law dimension, it is not inconsistent with HIPAA. The blood alcohol test results in *Hardy* were obtained via a grand

---

reinforce our conclusion in *Hardy* that any reasonable expectation of privacy that society may be prepared to recognize in health care information in general does not extend to evidence that is the subject of a legitimate investigation into the offense of driving while intoxicated.

[10] This provision reads: "A standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law. This general rule applies, except if one or more of the following conditions is met: . . . (b) The provision of State law relates to the privacy of individually identifiable health information and is more stringent than a standard, requirement, or implementation specification under subpart E of part 164 of this subchapter."

jury subpoena. 963 S.W.2d at 518, 527. As we have already observed, HIPAA expressly permits the disclosure of otherwise "protected health information" when it is sought by way of a grand jury subpoena. In short, nothing about HIPAA's preemption provision prohibits us from relying upon HIPAA itself as confirmation that society has *still* not recognized a reasonable expectation of privacy in "blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident"—at least not an expectation of privacy compelling enough to withstand invasion by a grand jury subpoena. For these reasons, it is Appellee's preemption argument, not our limited holding in *Hardy*, that must fall.

### III. ARTICLE 38.23

Under Article 38.23(a), evidence obtained in violation of state or federal law may not be admitted against the accused at his trial. TEX. CODE CRIM. PROC. art. 38.23(a). Thus, quite apart from Appellee's Fourth Amendment contention, his motion to suppress may have been valid if one or both of the grand jury subpoenas about which he complains was defective under either HIPAA or state statutory provisions governing their issuance.

The court of appeals believed that "the trial court made no finding . . . that the second grand jury subpoena was defective." *Huse*, 2014 WL 931265, at *6. As we have already observed, however, the trial court's written findings of fact and conclusions of law are at least ambiguous on that score, and an argument can be made that it found *both* grand jury subpoenas *duces tecum* to have been unlawfully issued, not just the first one. The court of

appeals concluded that the second grand jury subpoena *duces tecum* lawfully issued, and it believed that this conclusion essentially mooted the question of whether the first grand jury subpoena *duces tecum* was valid, since the medical records that the State proposed to use against Appellee at his trial were those "obtained" for purposes of Article 38.23(a) via the second grand jury subpoena. *Id*. For our part, we will take the opposite approach. For reasons we will explain, we harbor some doubt with respect to the legality of the second grand jury subpoena *duces tecum*. We conclude, however, that the first grand jury subpoena *duces tecum* issued lawfully, and so we will not ultimately pass on the lawfulness of the second.

### Was HIPAA Violated?

HIPAA itself does not set any parameters for what may constitute a valid grand jury subpoena; it simply permits the disclosure of otherwise protected health information "[i]n compliance with and as limited by the relevant requirements of . . . [a] grand jury subpoena." 45 C.F.R. §164.512(f)(1)(ii)(B). It does not purport to prescribe criteria for a valid grand jury subpoena *duces tecum*, as a matter of state or federal law. It would appear, then, that whether protected health information may be disclosed without violating HIPAA is a function of, at most, two circumstances: first, whether a grand jury subpoena *duces tecum* existed, and (perhaps) second, whether it validly issued in accordance with governing state or federal law. Here, the first circumstance was met—twice. Two grand jury subpoenas *duces tecum* issued in this case. That being so, there can be no possible cause to apply Article 38.23's exclusionary rule to a violation of HIPAA itself unless the grand jury subpoenas *duces tecum*

somehow failed to comply with the provisions in the Texas Code of Criminal Procedure that authorize their issuance. In short, whether HIPAA was violated wholly devolves into a question of whether one or both of the two grand jury subpoenas *duces tecum* that issued in this case failed to comport with state law. We believe that the first one—at least—was lawful.

**Was State Law Violated?**

Grand juries in Texas have the constitutional authority to investigate misdemeanor offenses such as Appellee's. *See* TEX. CONST. art. V, § 17 ("Grand juries empaneled in the District Courts shall inquire into misdemeanors . . ."). Also, "[a] subpoena may summon one or more persons to appear . . . on a specified day . . . before a grand jury[.]" TEX. CODE CRIM. PROC. art. 24.01(a)(2)(C). Either the foreman of the grand jury or "the attorney representing the State" has the authority to "issue a summons" (by which is apparently meant a subpoena) on the grand jury's behalf. TEX. CODE CRIM. PROC. arts. 20.10 & 20.11; George E. Dix & John M. Schmolesky, 41 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 23:27 (3d ed. 2011). "The subpoena may require the witness to appear and produce records and documents." TEX. CODE CRIM. PROC. art. 20.11; *see also* TEX. CODE CRIM. PROC. art. 24.02 ("If a witness have in his possession any instrument of writing or other thing desired as evidence, the subpoena may specify such evidence and direct that the witness bring the same with him and produce it in court."); Dix & Schmolesky, § 23:30, at 783 ("A grand jury subpoena can, under the general authority of Article 24.02 of the Code of Criminal

Procedure, direct the witness to bring specified instruments, writings, or 'other thing[s]' in his possession to the grand jury. Such a subpoena is a subpoena duces tecum."). And finally, "[t]he grand jury may compel the production of evidence . . . as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. Calandra*, 414 U.S. 338, 343 (1974).

Beyond the bare-bone provisions cited above, the Code of Criminal Procedure provides little guidance with respect to the proper (or improper) use of the grand jury subpoena power. Legal commentators have observed that, in states such as Texas, in which "the subpoena authority appears to be shared by the prosecutor and the grand jury[,] . . . it seems likely as a practical matter that the prosecutor will play the leading role in determining the evidence to subpoena[.]" Sara Sun Beale, et al., 1 GRAND JURY LAW AND PRACTICE § 6:2, at 6-10 (2d ed. 2015). Moreover, "as long as it is fairly clear that the grand jury's subpoenas are being used to further the grand jury's investigation—and not some separate interest of the prosecutor's—the courts have permitted the prosecutors to make their own decisions as to the issuance of subpoenas." *Id*. at 6-14. Prosecutors "do not have to obtain a grand jury's approval before issuing subpoenas; indeed, a grand jury may not even be aware that a prosecutor is issuing subpoenas on its behalf." Susan W. Brenner & Lori E. Shaw, 1 FEDERAL GRAND JURY: A GUIDE TO LAW AND PRACTICE § 9:2, at 342 (2d ed. 2006). And there is a presumption of regularity attending the purported acts of a grand jury, which the

opposing party has the burden to overcome. Sara Sun Beale, et al., 2 GRAND JURY LAW AND PRACTICE § 9:16, at 9-100 (2d ed. 2012); *Ex parte Rogers*, 640 S.W.2d 921, 923 (Tex. Crim. App. 1982); *see also United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) ("We begin by reiterating that the law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority.").

Despite this presumption of regularity, it is well settled that there are at least two purposes to which a prosecutor may *not* legitimately direct a grand jury subpoena. First, he may not use the grand jury subpoena as a subterfuge to obtain an investigative interview in his office—a so-called "office subpoena." Beale, *supra*, at 6-17; Brenner, *supra*, at 343. For example, "[t]he prosecutor's power to subpoena [on the grand jury's behalf] must not be used as a tool for police officers to force a suspect to talk when he previously refused to do so." *Guardiola v. State*, 20 S.W.3d 216, 225 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). However, "the courts have generally permitted prosecutors to meet with prospective witnesses in advance of their appearances before the grand jury, as long as the interviews with the prosecutors are optional, and as long as the witnesses are given the choice to appear before the grand jury rather than submit to an interview." Beale, *supra*, at 6-17. Second, it has been widely recognized by commentators and courts that have addressed the issue squarely "that it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial[,]" since by that time "the grand jury's investigative role is ended, and the rules of pretrial discovery take effect to govern the extent to which the parties

may use the legal process to obtain information about the case." Beale, *supra*, at 9-95, 9-96; *see also* Susan W. Brenner & Lori E. Shaw, 2 FEDERAL GRAND JURY: A GUIDE TO LAW AND PRACTICE § 21:10, at 234 (2d ed. 2006) ("It is improper to use a grand jury to obtain evidence for use at the trial of one who has already been indicted."); *In re Grand Jury Proceedings*, 814 F.2d 61, 70 (1st Cir. 1987) ("It is well established that a grand jury may not conduct an investigation for the primary purpose of helping the prosecution prepare indictments for trial."); *see also Rogers*, 640 S.W.2d at 923 ("It has been said that 'it is improper to use the grand jury for the purpose of preparing an already pending indictment for trial.' *United States v. Dardi*, 330 F.2d 316 (2nd Cir. 1964)."). However, commentators have also suggested that a grand jury may continue to investigate *other* potential charges, and "if, in the course of such legitimate investigative efforts, the prosecutor obtains evidence that is relevant to the pending case, it can use that evidence at trial." Beale, *supra*, at 9-98; *see also* Brenner, *supra*, at 234 ("It is not, however, improper for a grand jury to investigate the possibility that one who has been indicted may have committed other crimes even if the investigation discloses evidence relevant to charges in the indictment."). We will examine the grand jury subpoenas *duces tecum* in this case with these principles and practicalities in mind.

The court of appeals seems to have concluded that the second subpoena *duces tecum* was valid because the foreman of the grand jury signed the subpoena application, and his involvement was alone sufficient to invoke the presumption of regularity in grand jury

proceedings.[11] But we hesitate in this case to ratify that apparent conclusion. By the time the second subpoena issued, Appellee had already been charged by information with the offense in this case. While that first information had been dismissed by the time the second subpoena was requested and issued, the second information was filed the very next day after the second subpoena issued. Moreover, by the time the second information was filed, charging Appellee with the same offense as the first, the prosecution was aware of what was contained in the medical records, since it had already obtained the very same records from the very same source in response to its first grand jury subpoena *duces tecum*. These circumstances combine to suggest the possibility that the second subpoena *duces tecum* may not have issued for a legitimate *grand jury* investigative purpose, but solely for the purpose of securing evidence for the prosecution to use against Appellee at trial. If that is the case, it would not matter that the foreman of the grand jury signed the subpoena application—it may still have served an illegitimate purpose. *Rogers*, 640 S.W.2d at 623. While we do not decide that question today, the wide acceptance of the point of view by other commentators and courts is enough to cause us to hesitate to rely upon the presumption of regularity to sanction the second grand jury subpoena *duces tecum* on the particular facts of this case when, in our opinion, an alternative ground exists which leads us to conclude that the evidence was properly obtained.

We have no hesitation, however, in concluding that the first grand jury subpoena

---

[11] "[T]he medical records produced in this case were produced in response to the second grand jury subpoena, which was itself issued upon the request of the foreman of the grand jury. We will not look beyond the issuance of the subpoena to determine whether the matter is a legitimate matter of consideration by the grand jury." *Huse*, 2014 WL 931265, at *6.

*duces tecum* was proper. The trial court concluded that this subpoena was abusive "because it did not meet legislative requirements because no actual grand jury was involved" in its issuance. However, the trial court did not identify the specific legislative provisions it believed to have been violated. In its findings of fact, it found that the first subpoena *duces tecum* "was not directed to be returned to any actual grand jury." This finding of fact is simply unsupported by the record. The March 30th subpoena was addressed to one "BEVERLY BROOKS" at the Covenant Medical Center, and it expressly commanded her "to appear before the Grand Jury now in session" in Lubbock County with the relevant medical records, "then and there to testify as a witness before said Grand Jury[.]" It also issued before the charging instrument was filed, albeit only one day before. It is true that the subpoena application was signed by the prosecutor rather than the grand jury foreman. But as we have already noted, this was squarely in keeping with the provisions of the Code. TEX. CODE CRIM. PROC. arts. 20.10 & 20.11.

It is also true that the subpoena offered its recipient, Ms. Brooks, the option of complying by simply by contacting the prosecutor's office—presumably to arrange for delivery of the requested medical records to the prosecutor himself. But this practice does not seem to us to necessarily conflict with any of our grand jury related statutory provisions, and it does not seem to us to necessarily overstep the prosecutor's role to facilitate the investigative function of the grand jury, so long as the recipient retains the option instead to appear before the grand jury itself, as principally commanded. Nor does the statutory scheme

necessarily contemplate that the grand jury itself must even have been aware of the grand jury subpoena at the time it was issued. None of these circumstances surrounding the first grand jury subpoena conflicts with any of the relevant statutory provisions. And even in the aggregate, these circumstances are insufficient to surmount the presumption of regularity of the grand jury proceedings. We hold that Appellee has failed to establish any illegality attendant to the prosecutor's use of the first grand jury subpoena *duces tecum*. Because the State obtained the medical records in the absence of any specific statutory violation and in the absence of any manifest abuse of the grand jury's ordinary investigative function, Article 38.23(a) does not mandate that the records be suppressed.

## CONCLUSION

For these reasons, we affirm the judgment of the court of appeals.

DELIVERED:     April 13, 2016
PUBLISH