

## NUMBER 13-16-00596-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

RICHARD HYLAND,                                                     Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

On appeal from the 319th District Court
of Nueces County, Texas.

## OPINION ON REMAND

**Before Chief Justice Contreras and Justices Longoria and Hinojosa
Opinion by Justice Longoria**

Subsequent to publishing our memorandum opinion, the State filed a motion requesting that we publish the opinion. We grant the State's motion. Accordingly, this Court's memorandum opinion issued on October 31, 2019, is hereby withdrawn and the following is substituted therefor.

This case was remanded to us by the Texas Court of Criminal Appeals. *Hyland v. State*, 574 S.W.3d 904, 916 (Tex. Crim. App. 2019). The Court concluded that the police officer's affidavit as excised by the trial court established probable cause, reversed our previous judgment, and remanded the cause to us to address appellant Richard Hyland's remaining points of error. *Id*. at 916. The Court did not disturb our conclusion that the evidence was sufficient to support the operation and causation elements of an intoxication manslaughter offense. *See Hyland v. State*, No. 13-16-00596-CR, 2018 WL 1633487, at *12–13 (Tex. App.—Corpus Christi–Edinburg Apr. 5, 2018) (mem. op., not designated for publication). Accordingly, on remand, we now must determine (1) whether the evidence was sufficient to support a deadly weapon finding and (2) whether "the trial court should have suppressed the results of the third, warrantless search" of Hyland's blood. We affirm.

## I. DEADLY WEAPON FINDING

By his first issue, Hyland contends that the evidence was insufficient to support the finding that he used or exhibited a deadly weapon—namely, a motorcycle—during the commission of the offense of intoxication manslaughter.

### A. Standard of Review and Applicable Law

The test for determining whether the evidence is sufficient to support a criminal conviction is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in a light most favorable to the prosecution. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005).

"Deadly weapon" is defined as: (A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything

2

that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX. PENAL CODE ANN. § 1.07(a)(17). A motorcycle is not "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury[.]" TEX. PENAL CODE ANN. § 1.07(a)(17)(A). But it may, "in the manner of its use or intended use [be] capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B); *Nguyen v. State*, 506 S.W.3d 69, 76 (Tex. App.—Texarkana 2016, pet. ref'd) (a motor vehicle may be a deadly weapon where "the vehicle was intentionally, recklessly or negligently used as a weapon by the accused"). In any felony offense in which it is "shown" that the defendant "used or exhibited [a] deadly weapon" during the commission of the offense or in immediate flight therefrom, the trial court "shall" enter a deadly weapon finding in the judgment. TEX. CODE CRIM. PROC. ANN. art. 42A,054(c). Such a deadly weapon finding impacts a convicted felon's eligibility for community supervision, parole, and mandatory supervision. *See id.*; TEX. GOV'T CODE ANN. §§ 508.145(d)(1), 508.149(a)(1), 508.151(a)(2); *Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017).

To justify a deadly weapon finding under § 1.07(a)(17)(B), the State needs to establish only that "the manner" in which the motorcycle was either used or intended to be used was "capable" of causing death or serious bodily injury. *See Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008). When assessing a defendant's manner of driving, we examine whether a defendant's driving was reckless or dangerous. *Couthren v. State*, 571 S.W.3d 786, 790 (Tex. Crim. App. 2019). To support a deadly weapon finding, there must be evidence that the manner of driving was capable of causing death or serious bodily injury apart from the fact of a collision and the defendant's intoxication. *Id*.

**B.      Witness Testimony**

On the evening of May 30, 2014, Jaime Doherty[1] was killed in a motorcycle accident in Corpus Christi, Texas.  Three witnesses testified that they observed different portions of the events leading to the accident:   Juan Ledesma, Phyllis Ledesma, and Roger Villarreal.

Juan Ledesma testified that around 10:50 p.m., he was driving eastbound with his wife Phyllis when a motorcyclist emerged from the parking lot of the Frontier Saloon. According to Juan, the motorcyclist went "shooting across the road" and cut him off.  Juan jammed his brakes to avoid hitting the motorcycle, and the driver of the motorcycle swerved into the westbound lane to avoid the Ledesmas' vehicle.  The motorcyclist then veered back into the eastbound lane.  Juan saw that the driver of the motorcycle was male, and his passenger was a woman with long blonde hair flowing from under her helmet.  Ahead was an intersection where cars were stopped at a red light, and the motorcyclist was forced to hit the brakes and swerve to one side of a vehicle to avoid a collision.  Juan testified that the motorcyclist then "popped the clutch on the motorcycle," jolting the bike forward, and his female passenger nearly fell off the back.  Both Juan and Phyllis Ledesma testified that the motorcyclist was driving erratically, weaving in and out of traffic and varying his speed; at some points, it looked to Phyllis as though the motorcycle was going to lean and "tump[] over."

According to Juan, the motorcyclist then made a U-turn and began heading westbound.  Juan took a U-turn as well.  He saw the motorcyclist accelerate to a great speed.  Juan could not keep pace, and he soon lost sight of the motorcycle.

_____
[1] The decedent's first name is variously spelled in the record as "Jaimie" and "Jaime," and her last name also appears as "Dougherty."

4

Juan continued down the road until, roughly five minutes later, he came upon the scene of an accident: at a curve in the road, he saw two people on the ground, as well as the same motorcycle he had observed earlier. Juan recognized one person as the man driving the motorcycle, who was gasping for air. The other was a blonde woman with a lifeless expression. Neither one was wearing a helmet. Juan administered CPR to the woman until paramedics arrived. Juan later identified the two people as Hyland and his wife Doherty, who was also identified at trial by her mother.

Similar to Juan's testimony, Roger Villarreal attested that he was driving with his wife when he observed a motorcycle traveling at great speed, weaving in and out of traffic. He took note of the motorcycle's driver, whom he described as a larger male, as well as a smaller-bodied passenger, whom he believed to be a woman. Villarreal testified that he briefly lost sight of the motorcycle, but he soon came upon the scene of the accident, where he saw a man and a woman with the same stature as those riding the motorcycle "seconds" earlier. He joined Juan Ledesma in trying to revive Doherty.

## C. Analysis

Hyland argues that the evidence failed to establish that the manner in which he operated the motorcycle was reckless or dangerous. He contends that the record fails to establish "who was driving the motorcycle, how fast the driver was driving, the cause of the accident, the condition of the roadway, what manner the driver was driving seconds before the collision, whether the driver applied brakes before the collision, or whether the motor was still engaged when the accident occurred." In our previous legal sufficiency analysis, which the Court of Criminal Appeals did not disturb, we discussed the eyewitness testimony and determined that the evidence was sufficient to support the

5

finding that Hyland was operating the motorcycle. *See Hyland*, 2018 WL 1633487, at *12. Additionally, we found that the testimony supported a conclusion that Hyland was driving recklessly:

> This inference is also supported by testimony concerning Hyland's reckless driving, beginning with Juan Ledesma's observation of a motorcycle shooting out of the parking lot of the Frontier Saloon, swerving to avoid two near-misses, and accelerating so rapidly that Doherty nearly fell off. After Juan lost sight of Hyland, Villarreal observed similar driving, and he met the Ledesmas at the scene of the accident seconds later.

*Id.* The evidence established that Hyland was intoxicated with a blood alcohol content of 0.175, more than two times the legal limit of 0.08. That evidence, in addition to the testimony regarding Hyland's reckless driving leading up to the accident, and the resulting death to Doherty as a result of the accident, was sufficient to support a finding that Hyland was operating the motorcycle in a manner in which the motorcycle was "capable" of causing death or serious bodily injury. *See Couthren*, 571 S.W.3d at 790. Hyland's first issue is overruled.

## II. WARRANTLESS SEARCH

By his fourth issue, Hyland argues that the trial court "should have suppressed the results of the third, warrantless search of Mr. Hyland's blood." Specifically, Hyland argues that the State was required to get a second search warrant to re-test Hyland's blood. The State responds that the blood draw was done pursuant to a valid warrant executed by the Corpus Christi Police Department and the blood was lawfully in the possession of the State to test it.

Relying on *State v. Martinez*, 534 S.W.3d 97 (Tex. App.—Corpus Christi–Edinburg 2017), *aff'd*, 570 S.W.3d 278 (Tex. Crim. App. 2019), Hyland argues that the re-testing of his blood constituted a warrantless search of his blood, and therefore should have been

6

inadmissible. In *Martinez*, after a car accident, Martinez was transported by ambulance to a hospital where his blood was drawn by hospital staff "for medical purposes." *Id.* at 99. Martinez informed the hospital he did not want any tests performed on his blood, refused to provide a urine sample, and left the hospital. *Id.* Subsequently, a trooper with the Texas Department of Public Safety who was investigating the accident served a grand jury subpoena on the hospital and obtained four vials of Martinez's blood and his medical records. *Id.* Two of the vials were sent to the crime laboratory for testing. *Id.* A motion to suppress was granted wherein the trial court concluded that the search of the blood and subsequent tests were performed without the necessary search warrant. *Id.* On appeal, we held that the subsequent acquisition of Martinez's blood sample and later testing by law enforcement constituted a search by the State implicating Fourth Amendment protections. *Id.* at 102. Accordingly, because the testing of the blood was done without a warrant, we affirmed the trial court's suppression of the blood test results. *Id.*

Here, however, we are presented with a different fact pattern. Hyland's blood was not drawn by hospital staff for "medical purposes," but rather was drawn pursuant to a valid warrant being executed by law enforcement. The warrant instructed the officer to "search for, seize and maintain as evidence the property described in said Affidavit, to-wit: human blood from the body of [Richard Hyland]." The blood evidence obtained via the warrant was then maintained as evidence by law enforcement and the State, where testing of said evidence commenced. Therefore, unlike in *Martinez*, the search here was not warrantless. *See id.*

7

Hyland also relies on *Hardy v. State,* 963 S.W.2d 516 (Tex. Crim. App. 1997) and *State v. Huse*, 491 S.W.3d 833 (Tex. Crim. App. 2016) to support his argument, but again, the facts of those cases are distinguishable. In *Hardy*, the issue involved blood that was not only drawn by the hospital for medical purposes, but also tested by the hospital for blood alcohol content. *Hardy,* 963 S.W.2d at 518. The State did not obtain the blood in order to test it; instead, the State sought the hospital's test results. *Id*. at 523–24. There, the Court of Criminal Appeals held that the State's acquisition of the test results did not violate a legitimate expectation of privacy. *Id*. at 527. Similarly, in *Huse* the State acquired the medical records of Huse showing the results of his blood alcohol test that were performed by the hospital. 491 S.W.3d at 836–37. Again, the issue there was not as we have here, with a valid search warrant executed by law enforcement to obtain the blood of Hyland.

We disagree with Hyland that *Martinez, Hardy,* or *Huse* are controlling. Unlike those cases, here, the State had a valid search warrant and was not seeking Hyland's medical records. Hyland does not direct this Court to any authority or support, nor do we find any, that states that the State cannot re-analyze evidence lawfully in its possession pursuant to a valid search warrant. Accordingly, we overrule Hyland's fourth issue.

## III.     CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
21st day of November, 2019.

8