

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| RUBEN FERNANDEZ, JR., | § | |
| | | No. 08-17-00217-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 41st District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20160D02348) |
| | § | |

**O P I N I O N**

A jury convicted Ruben Fernandez, Jr., of one count of aggravated assault with a deadly

weapon and one count of family-violence assault against a household member after a previous

conviction.[1]  In four issues, Fernandez challenges both convictions by raising complaints about

matters occurring before and during trial to include the State's request for a writ of attachment

against its complaining witness, the excusal of a juror for disability after experiencing a sudden

illness, and the admission of complained-of extraneous evidence during the guilt-innocence phase

of trial.  Finding no error, we affirm.

**BACKGROUND**

---

[1] *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Aggravated Assault and the Use or Exhibiting of a Deadly Weapon during the commission of the offense) and TEX. PENAL CODE ANN. § 22.01(b)(2)(A) (Assault to a Family or Household Member with Previous Conviction).

*Pre-trial Proceedings*

Fernandez was initially indicted on August 26, 2015, then re-indicted on May 18, 2016, having been charged with committing the two offenses referenced above. Both offenses were alleged to have been committed on or about April 25, 2015, against the same victim, Cynthia Flores, by means of striking her with a clothing iron. During pre-trial proceedings, the trial court entered a discovery order that required the State to give written notice seven days before trial of any extraneous offenses that it intended to introduce in its case-in-chief. On October 27, 2015, Fernandez also filed a request for notice of any extraneous acts that the State intended to use and requested that any notice be given not later than seven days in advance of the start of trial. Prior to trial, the State filed a series of notices to the defense that detailed the extraneous acts it would potentially use during both the guilt and punishment phases of trial. The State's notices alleged over a dozen unreported bad acts committed by Fernandez against Flores which were characterized as demonstrating, "[c]ontinuous physical, verbal and emotional abuse; [against] victim [Cynthia Flores][.]"[2]

*Guilt Phase of Trial before Opening Statements*

Trial commenced on the morning of Monday, September 11, 2017, and both sides

---

[2] The State's notices included the following alleged bad acts by Fernandez: (1) making a false report to law enforcement, the victim of which was Cynthia Flores, on or about April 25, 2015; (2) committing an act of criminal mischief against Cynthia Flores on or about April 25, 2015; (3) assaulting Cynthia Flores on or about August 3, 2015; (4) taking Cynthia Flores' prosthetic eye; (5) destroying Cynthia Flores' prosthetic eye; (6) throwing Cynthia Flores' prosthetic eye; (7) assaulting Cynthia Flores in the presence of her family; (8) assaulting Cynthia Flores in the presence of Fernandez' family; (9) assaulting Cynthia Flores by placing his hand in her mouth; (10) assaulting Cynthia Flores by striking her head; (11) assaulting Cynthia Flores by head-butting her; (12) forcing Cynthia Flores to sign a non-prosecution affidavit; (13) forcing Cynthia Flores to quit her job; (14) accusing Cynthia Flores of sleeping around; (15) telling Cynthia Flores that he did not want her daughter to live with them; and (16) threatening Cynthia Flores by pointing a gun at her daughter.

announced ready.  After a twelve-person jury and one alternate juror were empaneled and sworn, the jurors received preliminary instructions and then departed for their lunch break.  Outside the jury's presence, the State then requested a forfeiture-by-wrongdoing hearing under article 38.49 of the Code of Criminal Procedure.[3]  The State informed the court that Cynthia Flores, the alleged victim, had failed to appear for trial that morning despite having been served with a subpoena compelling her attendance which included a duces tecum requiring Flores to also bring her daughter, A.F., to court.[4]  In requesting a hearing, the State asserted it could establish through witness testimony that wrongdoing on the part of Fernandez had led to Flores' non-appearance for trial.  Based on article 38.49, the State argued that Fernandez should forfeit his right to object to the admissibility of any prior statements by Flores so as not to benefit from his alleged wrongdoing.

Before witnesses were called, the parties engaged in a lengthy discussion with the court about Flores' non-appearance and the alleged conduct by Fernandez that would be considered relevant to the scope of the hearing.  During this colloquy, the State gave its first indication on the record that it had sought and obtained a writ of attachment from the trial court earlier that morning commanding the arrest of Flores and for her to be immediately brought to the court once she was taken into custody.  When asked to respond, defense counsel primarily focused on evidentiary concerns he had with the State's evidence relevant to its request for a forfeiture by wrongdoing.

---

[3]  Under the long-standing common law doctrine of forfeiture by wrongdoing, a defendant is barred from asserting either Confrontation Clause or hearsay objections to the admission of an out-of-court witness's statements where the defendant wrongfully procured the unavailability of the witness.  *See Colone v. State*, 573 S.W.3d 249, 264-65 (Tex. Crim. App. 2019); *see also Schindler v. State*, No. 02-17-00241-CR, 2018 WL 4924946, at *3 (Tex. App. – Fort Worth Oct. 11, 2018, pet. ref'd) (mem. op., not designated for publication).  In Texas, this doctrine has been codified in article 38.49 of the Code of Criminal Procedure.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.49.

[4] To protect the identity of Flores' minor daughter, this opinion will refer to the child as A.F.  *See* TEX. R. APP. P. 9.10(a)(3), (b)-(d).

Rather than seek a forfeiture hearing, defense counsel suggested that the State could request a writ of attachment as their appropriate remedy to address Flores' absence from trial. The trial court then acknowledged having earlier signed a writ of attachment as requested by the State. Defense counsel responded by objecting to the prolonged delay caused by the proposed hearing given that the State had earlier announced ready for trial. The trial court asked whether defense counsel had thought that the State had witnesses ready for trial. Counsel responded that he knew there was a possibility that Flores would not cooperate with the State as she had expressed to him her desire of not wanting "to go through with this case." Contrary to the State's argument, however, defense counsel indicated he would assert to the court that Flores was afraid to appear because she had given a false statement to the police about the events in question.

Proceeding with the hearing, the State called a witness who worked for the District Attorney's Office assigned to victims' assistance, among others, to establish that Fernandez engaged in conduct designed to cause Flores not to be present for trial. The victim assistance witness testified that Flores had five to ten contacts with her over the course of many months and during those occasions Flores had described ongoing incidents of abuse against her, but also at times recanted the allegations she made of having been abused. For example, the witness described that on one occasion she received an email purportedly from Flores (albeit with Fernandez' email address) stating that she wanted the charges dropped as she was back with Fernandez and they were doing great. But later, when Flores came into her office in person, she denied sending the email and claimed it had been sent by Fernandez himself. The State's witness testified that Flores signed an affidavit attesting that she had not sent the email in question. The witness also testified that on another occasion Flores had revealed to her that she had signed a non-prosecution statement

4

in which she claimed she had lied about Fernandez hitting her and she had wanted the charges brought against him dropped. The witness testified that Flores told her she had injured herself while working or something of that nature. The last contact with Flores occurred in October of 2016, or eleven months prior.

During the hearing, when the trial court asked defense counsel if he had any objection to admitting the copy of the writ of attachment which had been issued (State's Exhibit 2), defense counsel expressed his concern at how the writ had been signed by the court without his knowledge and outside his presence, but he sought no ruling from the court nor lodged an objection:

> Well, Judge, I mean, no objection to State's 2 for the purposes of this hearing, but I'm a little bit puzzled, as defense counsel, as to how the prosecutors were approaching the Judge to sign the writ of attachment and the defense counsel was not present and was not made aware that a writ of attachment had even been signed until later on this morning. So, clearly, I've got some additional questions about, I mean, how that whole process came about. We had no idea until about an hour ago, Judge.
>
> But for the purposes of this hearing and that specific exhibit, no, I don't object but later on I will have an objection, Judge.

At the close of the hearing, the trial court denied the State's request for forfeiture based on insufficient evidence to show conduct by defendant designed to keep the complainant from appearing. Nonetheless, even though the trial court denied the forfeiture by wrongdoing, the court thereafter recessed the proceeding until the next morning to give the State time to attach Flores pursuant to the writ that had been issued hours earlier.

The next morning on September 12, the defense announced ready for trial, but the State did not. The State instead requested a continuance until Friday, September 15, for additional time to locate Flores and A.F. Defense counsel objected to the continuance, but the trial court, noting its concern about jeopardy attaching if it declared a mistrial, granted a recess until Friday.

5

On the morning of Friday, September 15, the defense announced ready for trial, and the State once again announced that it would be requesting a continuance pursuant to a motion it filed that same morning. The State requested more time to locate Flores and A.F. The trial court held a hearing on the continuance, but the hearing was abruptly cut short when the State brought a detective into the courtroom to inform the court that the El Paso Police Department had just then found Flores and A.F. at a hotel. The court then excused the detective to allow him to proceed with the writ of attachment. Defense counsel then renewed his concern about the trial court's issuance of the writ of attachment and objected that proper procedures were not followed as required by the Code of Criminal Procedure. Defense counsel more specifically argued that the trial court did not follow the proper procedure under article 24.12 of the Code in that the court did not require the State to articulate on the record the grounds for its motion for writ of attachment and "articulate sufficient information about the expected testimony to show materiality." While arguing, defense counsel asserted that the Court of Criminal Appeals had interpreted article 24.12 as requiring counsel, when seeking a writ, to assert on the record the grounds for his or her motion and the expected testimony of the witness being attached to show materiality. *See Sturgeon v. State*, 106 S.W.3d 81, 90 (Tex. Crim. App. 2003).

Responding, the State asserted that Fernandez had no standing to contest or question any subpoena issued by the State for its witnesses or for a writ of attachment for the complaining witness. During the ensuing dialogue, the trial court noted its understanding that issuance of a writ of attachment was a matter of right so long as a witness was duly served with a subpoena and failed to appear, and the court explained its belief that the showing of materiality, as discussed in *Sturgeon v. State*, applied to the preservation requirements when the court has denied a request for

6

a writ of attachment. The court then overruled defense counsel's objection to the issuance of the writ. At this point, attorney Nicole Maesse appeared before the Court having been informed by defense counsel that her client, Cynthia Flores, would likely testify soon in the proceeding. Attorney Maesse informed the trial court that she currently represented Flores on an unrelated charge of criminal trespass that did not involve Fernandez, and which allegedly occurred a year and five months after the two charges that were filed against Fernandez. Discussion ensued about issues that could arise during Flores' expected testimony. Shortly before recessing to await return of the jury, the court informed the parties she had received notice that Cynthia Flores and her daughter A.F. had arrived. Arrangements were made for attorney Maesse to speak with the State and Flores about the intended scope of Flores' testimony.

When court reconvened outside the jury's presence, attorney Maesse requested that the court appoint her to represent Flores for purposes of providing her with assistance during her expected trial testimony. The trial court permitted this request. The State then informed the court that Flores expressed anger at being brought to court and had claimed that the allegations against Fernandez were based on lies she had made up.[5] The State further indicated that even though it had only just begun speaking with A.F., the minor child had thus far divulged that both her mother and Fernandez had been trying to keep her and her mother hidden away so that they would not be available to testify. A.F. also said that her mother asked her to lie if she was called as a witness.

The State also disclosed that A.F. had thereafter described a series of extraneous bad acts

---

[5] The State further informed the trial court that it did not believe that Flores had lied about the incident or that she hit herself. The State then informed the court and Fernandez' counsel and attorney Maesse that it would not prosecute Flores for perjury—whether for statements made to law enforcement, at the time of the investigation, or at trial—despite her expected recantation.

committed by the defendant against her and her mother. While acknowledging that neither side was previously aware of the alleged incidents, the State confirmed its intention to introduce evidence of any extraneous bad acts committed by the defendant of which it newly learned and that it would be disclosing further details to the defense as quickly as possible. Defense counsel responded that the timing of any disclosures would be unbelievably disadvantageous to Fernandez because it caught counsel by "utter surprise" and would not give counsel adequate opportunity to prepare a defense. Defense counsel requested a continuance, and the trial court denied the request based on the impact of the continuance on the victims in the case. Instead, the trial court brought A.F. to the witness stand in order to give both sides an opportunity to determine how she might testify by examining her outside the presence of the jury.

A.F., who was thirteen years' old and in the seventh grade at the time of trial, testified about how her mother and Fernandez, along with the help of two of Fernandez' children, conspired to keep A.F. and Flores hidden so they could not be brought to court, believing that "[if] they don't find us until Friday, this case is going to be dropped." She also testified that Flores had told A.F. to lie and not say anything about the allegations against Fernandez. After testifying about her knowledge of Fernandez' charged offenses, A.F. then testified about multiple extraneous bad acts committed by Fernandez against her mother, and defense counsel was allowed to cross-examine her about those matters.

After A.F. testified, the parties and trial court agreed to recess until Monday morning. However, before the parties left for the day, the trial court excused one of the jurors for medical reasons without objections from either side, and the court replaced that juror with the alternate juror who had previously been sworn with the other jurors. Pending the resumption of trial on

8

Monday, September 18, the trial court detained Flores in the El Paso County Jail pursuant to the writ of attachment and allowed A.F. to leave with Flores' sister. Addressing Flores, the trial court stated it had determined that Flores had violated a court order and that she had taken extreme measures including keeping her child from school in an effort to avoid testifying despite having been subpoenaed. Noting that the trial court had expended resources to ensure Flores' attendance, the court determined it was necessary to further detain her to ensure her attendance. No objections were made by any parties and the trial court then recessed until Monday.

*Guilt Phase of Trial after Opening Statements*

Trial resumed on Monday, September 18.[6] During the State's opening statement, Juror Garcia interrupted and expressed that he was "feeling a little sick." The trial court retired the jury. After a recess, the trial court stated on the record that the juror said he had gotten lightheaded and felt as though he was going to faint. When the trial court asked the juror if he wanted to go home, he said that he did not want to leave. After another recess, the trial court stated that the court staff made a call to emergency medical services to check on the juror's vitals because he was not feeling better. After yet another recess, the trial court stated in the presence of both the State and defense that the juror described his condition as one where he felt "shaky, nervousness and wanting to faint." The bailiff had given the juror something to eat in case the issue was caused by blood sugar, but even after eating and after emergency medical services confirming that the juror's vitals were okay, the juror did not feel better. The trial court then informed both parties that the court was going to excuse the juror as being disabled. The trial court stated that someone was going to drive

---

[6] The record shows that attorney Linda Perez of the El Paso County Public Defender's Office appeared on behalf of Cynthia Flores and remained present until the conclusion of Flores' testimony.

9

to the courthouse to pick up the juror because he was in such an ill state that he did not feel he could drive himself from the courthouse.

Defense counsel objected to proceeding with only eleven jurors and requested a mistrial because "we believe that not less than 12 jurors can render and return a verdict in a felony criminal case." When the trial court asked counsel to further refine his objection as to proceeding with only eleven jurors, counsel stated, "we think that it is premature to maybe release this juror." Defense counsel cited to article 36.29 of the Code of Criminal Procedure for his argument. Defense counsel also began to ask if the juror had already left the building when the trial court interrupted and stated that it was not going to make the juror sit for the trial because, based on the trial court's personal observations of the juror, "[h]e is clearly sick," and "the health of that juror clearly is compromised and he cannot participate in this trial." The trial court further stated, "[t]here is no question in my mind that he is disabled under the definitions provided in the case law." After the interjection, defense counsel reiterated only his objection under article 36.29, and the court overruled the objection. Opening statements continued, and Flores was then brought into the courtroom as the State's first witness.

*Witness Testimony*

Flores testified on direct examination that she and Fernandez had been in a common-law marriage for four years and were still together at the time of trial. Fernandez began living with Flores on the day they met, and the two lived together with A.F. When the State asked Flores to tell the jury about her relationship with Fernandez, Flores testified that she had a good relationship with Fernandez even though they would argue at times and would have "ups and downs." The State then asked Flores to "tell us a little bit more about the downs of your relationship," and Flores

10

testified that she had a history of mental health issues and would sometimes get in her "moods." The State then asked, "So if any problems arise in your relationship, you're going to say that they're your fault?" Flores responded affirmatively.

Flores further testified on direct that she remembered speaking to police on April 26, 2015 and making a false police report. She described that a day earlier she and Fernandez had gotten into an argument at their home, and Fernandez decided to move out. She then went to a friend's home where she drank to the point of intoxication before going to her brother's home, even though she did not remember how she got to his home. Flores testified that she only remembered in general what she told police or how they were contacted. However, she remembered that she was at work on that day, and when she arrived home from work, part of her argument with Fernandez was about him wanting her to quit her job. In addition, she remembered telling officers that Fernandez hit her with an iron, but she explained that the allegation was false. She also testified that she got a bruise on her arm that day while using the walk-in freezer at work.

Flores further testified on direct that she spoke with representatives from the District Attorney's Office and told them that she lied about Fernandez hitting her with an iron. Although she acknowledged receiving a subpoena for herself and a subpoena requiring her to bring A.F. to court, as well, Flores testified that she did not come to court because A.F. was sick and had cramps. Flores explained that she and A.F. then got a hotel room on Tuesday, September 12, "[b]ecause I wanted to," and that they stayed there all week until Friday, September 15, when detectives found them.

On cross-examination, Flores testified that she was diagnosed as bipolar and had post-traumatic stress disorder, anxiety, and depression. She had been diagnosed with these mental-

11

health conditions since 2008 and prescribed medication at that time. Flores testified that she would get into bad moods and get agitated when she did not take her medication. She also affirmed that she and Fernandez had a good relationship. Flores testified that she did not want Fernandez to move out because he was the breadwinner of the two and supported both of them financially. After their argument on the day of the charged offense, Flores took his vehicle because she did not have one of her own. Flores further explained on cross-examination that the freezer door at her workplace was very heavy and that the door slammed on her arm.

After cross-examination, the State informed the trial court that it intended to introduce evidence of extraneous offenses by Fernandez because "the door's been opened a few times through cross-examination[.]"[7] The court also observed that evidence of the nature of the relationship between Flores and Fernandez appeared to be relevant due to the content of Flores' testimony thus far. Defense counsel objected to the admission of any extraneous offenses and asserted that he did not raise any defensive theory not first elicited by the State, explaining, "if they're going to argue that I opened it, they were surely knocking awfully hard . . . They can't open the door themselves, and then be surprised if I ask a question or two about it, Judge. Because that's what's happened here." The trial court ruled that A.F. would be allowed to testify about Fernandez' extraneous offenses against Flores.

When called by the State, A.F. told the jury that her mother did not want her to testify. She told the jury that she and her mother had been staying at a hotel during the week leading up to her

---

[7] Earlier in the morning during one of the recesses taken to address Juror Garcia's condition, the trial court discussed with the parties the possible admissibility of Fernandez' extraneous offenses. That morning, the State had filed two mid-trial supplemental notices of extraneous offenses in which it detailed the newly-discovered offenses described by A.F. and filed a memorandum in support of their admission. During the conversation amongst the trial court and both sides, defense counsel acknowledged having received the State's filings the night prior.

testimony because her mother was trying to avoid being tracked down and brought to court, and her mother also kept her out of school for that entire week. A.F. testified that Fernandez initially treated her mother well when they first met, but Fernandez' behavior later changed. A.F. next described a series of incidents she had witnessed between her mother and Fernandez.

Around July 2014, A.F. heard her mother and Fernandez arguing, and when A.F. went to use the restroom, A.F. saw Fernandez punching her mother while her mother was trying to get Fernandez off of her. Then, around November 2014, A.F. and her mother were asleep in the same room when Fernandez began banging on the door. When A.F.'s mother opened the door, Fernandez began yelling at her and punching her. Later, around May 2017, A.F.'s mother said something to Fernandez that "set him off," and Fernandez began beating her mother. After A.F. ran to her room, her mother walked into the room with a busted lip and with her hair messed up. Around August 2017, A.F.'s mother and Fernandez were arguing, and Fernandez pulled out a "BB gun" on her mother. When A.F. went to the garage to feel safer, she heard the gas from the stove turn on and heard her mother screaming and telling him to stop. Throughout the time A.F. and her mother lived with Fernandez, A.F. saw her mother injured with "[b]ruises, black eyes, swollen lips, like cuts on her face—on her face, bloody noses." A.F. also heard Fernandez threaten to kill her mother multiple times during their fights.

When asked directly about events of April 25, 2015, A.F. first described that she had earlier moved in with her grandmother because she had felt unsafe living with her mother and Fernandez. That evening she received a call on her cell phone from her mother, who A.F. described as sounding "[f]rustrated, emotional . . . [l]ike rushed . . . [s]he's yelling." On the call, as her mother cried and seemed frustrated, mad, and emotional, she described to A.F. what had just occurred.

13

A.F. testified that her mother said, "[Fernandez] beat me and he hit me with an iron. I'm at my friend's house and I need someone to come pick me up right now." A.F. hung up and told her grandmother about the call. Later that same evening, A.F. testified that her uncle Pat came to her grandmother's home, but she was excluded from their conversation and had no further contact that day from her mother.

After A.F. concluded, the remainder of the State's case consisted of testimony from Flores' brother, Patrick, and from Officer Mendez, who responded to Patrick's call to 911. Patrick testified that he received a frantic call from Flores on the afternoon of April 26, 2015. He described her voice as scared and stuttering. Flores uttered, "He beat me. He hit me with an iron." Patrick asked for her location, and when he arrived at her house, he saw that her face had some swelling and she had a bruise on her forearm. After the two arrived at Patrick's home, Patrick called 911. Once Officer Mendez arrived on scene, he spoke to both Flores and Patrick separately, and he took a photograph of the bruise on Flores' left arm. The next day, on April 27, Patrick took Flores back to her shared home with Fernandez. At the home, Patrick described how he saw broken bottles and what appeared to be the remnants of a scuffle in the kitchen. He also saw Flores' clothes on the floor with bleach poured on them.

Once the State rested its case-in-chief, Fernandez admitted a copy of a 911 call he made on the evening of the same day as his charged offenses. In his call, Fernandez claimed that Flores had stolen his vehicle and phone about forty minutes prior to him calling 911. He further explained on the call that the two had gotten into an argument and that, even though Flores might claim he assaulted her, he reported that neither one of them had struck the other.

*The Verdict and Punishment*

14

The jury convicted Fernandez of both counts as charged. After Fernandez pleaded true to felony enhancements alleged in the indictment on each count, he was subjected to a first-degree felony punishment range for the aggravated-assault count and to a second-degree felony punishment range for the family-violence count. *See* TEX. PENAL CODE ANN. §§ 12.42(a), (b); 22.01(a)(1), (b)(2)(A); 22.02(a)(2), (b). In addition to introducing multiple judgments showing other offenses Fernandez had committed, the State had A.F. and Flores' sister testify generally about how Fernandez threatened to rape and kill A.F., kept A.F. in fear, and kept Flores in an isolated, abusive situation. Flores also testified in the punishment phase of trial. Flores acknowledged that she should have protected her daughter A.F., but instead she always put Fernandez first. And while she did not expressly acknowledge having earlier lied to the jury in the guilt phase of the trial, Flores testified that even though she loved Fernandez she felt tired of the hiding and of having to go through pain caused by his abusive conduct. She testified that Fernandez would say, "Sorry. I'm not going to do it again. And it keeps happening, his drinking. He has a problem."

After deliberating, the jury assessed his punishment at forty years' confinement for the aggravated-assault count and twenty years' confinement on the family-violence count. As to each count, the jury also assessed a maximum fine of $10,000. The trial court sentenced Fernandez in accordance with the jury's verdicts and ordered his sentences to run concurrently. Fernandez then filed his notice of appeal.

## DISCUSSION

### *Issue 1: Whether the Alleged Ex Parte Communication Violated Due Process*

In his first issue, Fernandez argues that the trial court violated Canon 3(B)(8) of the Code

15

of Judicial Conduct by engaging in an *ex parte* communication regarding the State's request for a writ of attachment which thereby deprived him of his right to an impartial judge and a fair trial. In response, the State asserts that: (1) the trial court did not violate its duty to remain impartial by engaging in an *ex parte* communication that did not involve a discussion of the merits of the case; and (2) assuming *arguendo* that the complained-of communication was improper, Fernandez failed to show he was prejudiced by the trial court's failure to address the matter in his presence. Because we find that Fernandez has failed to demonstrate any harm or reversible error on this issue, we disagree with his argument and expressly decline to needlessly weigh in on whether the nature or extent of the challenged conduct resulted in an improper *ex parte* communication.

### Standard of Review

To determine whether a violation of the Code of Judicial Conduct amounts to reversible error, we must examine the record as a whole to determine whether the trial judge engaged in impropriety that was harmful. *See Erskine v. Baker*, 22 S.W.3d 537, 540 (Tex. App. – El Paso 2000, pet. denied); *Soto v. State*, No. 08-05-00227-CR, 2007 WL 4214399, at *6 (Tex. App. – El Paso Nov. 29, 2007, no pet.) (not designated for publication).

### Alleged Violations of the Code of Judicial Conduct

Canon 3(B)(8) of the Texas Code of Judicial Conduct addresses *ex parte* communications and provides as follows:

> A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding. A judge shall require compliance with this subsection by court personnel subject to the judge's direction and control. This

16

subsection does not prohibit:

> (a) communications concerning uncontested administrative or uncontested procedural matters . . . .

TEX. CODE JUD. CONDUCT, Canon 3(B)(8), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B. The purpose of prohibiting *ex parte* communications is to ensure all legally interested parties are given their full right to be heard under the law and to ensure equal treatment of all parties. *Abdygapparova v. State*, 243 S.W.3d 191, 207 (Tex. App. – San Antonio 2007, pet. ref'd); *Smallwood v. State*, No. 08-12-00215-CR, 2014 WL 4269155, at *6 (Tex. App. – El Paso Aug. 29, 2014, pet. ref'd) (not designated for publication).

The Fourteenth Amendment provides that the State may not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV; *see also* TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land."). Due process requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). A defendant is entitled to a fair trial before a judge with no actual bias against the defendant or interest in the outcome of the case. *Avilez v. State*, 333 S.W.3d 661, 673 (Tex. App. – Houston [1st Dist.] 2010, pet. ref'd) (citing *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)). Accordingly, a judge should not act as an advocate or adversary for any party. *Dockstader v. State*, 233 S.W.3d 98, 108 (Tex. App. – Houston [14th Dist.] 2007, pet. ref'd). However, most complaints about a judge or the conduct of a trial do not implicate constitutional due process protections. *See Avilez*, 333 S.W.3d at 673-74.

Mere violations of the Code of Judicial Conduct alone do not constitute reversible error,

17

and even unethical conduct is not necessarily a legal ground for reversal of a criminal conviction. *Wesbrook v. State*, 29 S.W.3d 103, 121 (Tex. Crim. App. 2000); *Kemp v. State*, 846 S.W.2d 289, 305 (Tex. Crim. App. 1992); *see also Serrano v. State*, No. 08-17-00190-CR, 2019 WL 1922753, at *9 (Tex. App. – El Paso Apr. 30, 2019, no pet.) (not designated for publication). This is because the Code is designed to provide guidance to judges and to provide a structure for regulating conduct through the State Commission on Judicial Conduct. *Merritt v. Davis*, 331 S.W.3d 857, 863 (Tex. App. – Dallas 2011, pet. denied); *Serrano*, 2019 WL 1922753, at *9. For reversal on the grounds of judicial misconduct, there must be judicial impropriety, coupled with probable prejudice to the complaining party, and rendition of an improper verdict. *Erskine*, 22 S.W.3d at 539; *Soto*, 2007 WL 4214399, at *4. And for complaints regarding alleged *ex parte* communications, no prejudice is shown where the appellant fails to point to record support showing that the communications influenced the court's decision-making. *See Acevedo v. State*, No. 04-10-00025-CR, 2011 WL 1044402, at *5-6 (Tex. App. – San Antonio Mar. 23, 2011, pet. ref'd) (mem. op., not designated for publication); *cf. Waller v. State*, No. 01-02-00799-CR, 2004 WL 306032, at *4 (Tex. App. – Houston [1st Dist.] Feb. 19, 2004, no pet.) (mem. op., not designated for publication).

*Application*

Even assuming that an improper *ex parte* communication occurred—which we do not decide—Fernandez would nonetheless be required to further show judicial impropriety, coupled with probable prejudice to him, and rendition of an improper verdict. At trial, defense counsel asserted that the writ of attachment had been issued without notice to Fernandez and without compliance with procedures required by article 24.12 of the Code of Criminal Procedure. More particularly, defense counsel complained about the State failing to articulate information on the

18

record about the expected testimony of the witness to be attached to show materiality. Notably, however, Fernandez did not show how his lack of presence at the time of the alleged communication with the court regarding the non-compliance of a complaining witness in responding to a trial subpoena had caused prejudicial harm to him or how his presence would have made a difference in the trial court's ruling. *See Acevedo*, 2011 WL 1044402, at *5-6 (holding that a single, unfortunate *ex parte* communication to the trial judge did not necessarily indicate the court's abandonment of its role as an impartial judge where nothing in the record supported an assertion that the communication to the judge influenced the judge's decision-making); *see also Erskine*, 22 S.W.3d at 539-40; *Soto*, 2007 WL 4214399, at *6 (cases overruling appellants' complaints regarding the trial judge's *ex parte* communications where the appellants failed to show how the communications may have resulted in the rendition of an improper judgment or verdict); *cf*. *Waller*, 2004 WL 306032, at *3-4 (rejecting contention that administrative judge erred in denying motion to recuse presiding judge of the trial court where the presiding judge's *ex parte* discussion of the defendant's bond with the court's bailiff did not result in a change of defendant's bond and therefore did not show that a reasonable person, knowing all the circumstances involved, would harbor doubts as to the impartiality of the court).

Based on Fernandez' failure to demonstrate probable prejudice on his alleged ground of judicial impropriety, we hold that there could be no reversible error here. *See Erskine*, 22 S.W.3d at 539; *Soto*, 2007 WL 4214399, at *4; *see also Wesbrook*, 29 S.W.3d at 121; *Kemp*, 846 S.W.2d at 305; *Serrano*, 2019 WL 1922753, at *9. For this reason, we overrule Fernandez' first issue.[8]

---

[8] In his brief to this Court, Fernandez argues that the trial court's alleged *ex parte* communication with the State led to the court's failure to maintain "an attitude of impartiality throughout the trial," and he lists eighteen actions taken by the court throughout the course of the trial that he believes demonstrate the resulting unfairness. However, as stated

### *Issue 2: Whether the Trial Court Erred in Granting the Writ of Attachment*

In his second issue, Fernandez argues that the trial court erred in granting the writ of attachment for Flores and A.F. where the requirements for such a writ under articles 24.12 and 24.111 of the Code of Criminal Procedure were not met. As a result, Fernandez argues that testimony from the attached witnesses, Flores and A.F., should have been excluded under article 38.23 of the Code of Criminal Procedure and that his substantial rights were prejudiced.[9] In opposing, the State first acknowledges on appeal that Fernandez is correct when he states that revised procedures delineated in articles 24.12 and 24.111 of the Code, which went into effect eleven days before trial, were not followed by the trial court.[10] *See* Act of April 5, 2017, 85th Leg., R.S., ch. 292, § 3, 2017 Tex. Gen. Laws 541, 542 (codified at TEX. CODE CRIM. PROC. ANN. art. 24.12 and 24.111). Specifically, the State acknowledges that new provisions require that before a writ of attachment can be issued, a court hearing has to be held, and the involved witness has to be assigned a court-appointed attorney to protect his or her interests. Here, the State acknowledges

---

by him in his brief, his complaint arises solely from the communication itself regarding issuance of the writ of attachment. And none of the listed actions address nor demonstrate how the trial court's ruling on issuance of the writ of attachment, specifically, would have changed had Fernandez been given an opportunity to participate in the alleged *ex parte* communication. Notably, Fernandez never asserts nor questions the materiality or lack thereof of Flores' expected testimony. Therefore, we find those eighteen instances inapt to our harm analysis and insufficient to demonstrate the sort of prejudice he needed to show to carry his evidentiary burden.

[9] Although the writ of attachment commanded only that Flores be brought to court, we will assume for purposes of this appeal that it also conferred authority for an attaching officer to bring A.F. to court, as well, since Flores disobeyed the subpoena duces tecum requiring her to bring A.F. to court. Furthermore, both parties in this appeal address the issue as one which contends that exclusion of testimony from both Flores and A.F. was at stake by resolution of the issue. For the reasons discussed below, we conclude that the outcome of the issue would not change regardless of whether Fernandez could properly challenge the testimony of either one or both witnesses that were affected by the attachment.

[10] The record shows that the State believed that it was entitled to the writ of attachment upon a mere showing that Flores had been duly served and failed to appear. Similarly, the trial court granted the writ of attachment based on its understanding that the attachment of a witness who had been duly served was a matter of right regardless of whether requested by either the State or the defense.

that no writ-of-attachment request supported by affidavit was filed, no hearing was held, and no attorney was appointed to assist Flores at the time of the State's initial request for issuance of the writ of attachment. Nonetheless, despite these deficiencies, the State argues that Fernandez' argument is without merit for the following reasons: (1) that Fernandez mistakenly argues as though the State's writ-of-attachment request had been denied; (2) that Fernandez waived his complaint on appeal because he did not raise the same objection at trial; (3) that Fernandez fails to cite to any authority to support his position that a failure to follow procedures that were meant to protect victims should result in the exclusion of testimony from Flores and A.F. pursuant to the exclusionary rule; (4) that Fernandez lacked standing to challenge the procedures because the legislature did not intend to protect defendants when it enacted these procedural changes and any claim that the legislative changes were not adhered to belonged to Flores, not Fernandez, as his own personal rights were not implicated; and (5) that concerns for the attached witness that the newly enacted procedures were meant to address were honored by the trial court and Fernandez was not harmed by the lack of a hearing on the State's writ-of-attachment-request. Because we hold that Fernandez did not establish he had any standing—under his article 38.23 theory of exclusion—to complain about the State's failure to comply with writ-of-attachment-requirements that were enacted for the protection of a trial witness, we address the standing argument but we need not address the State's alternative responses.

### Writs of Attachment

An "attachment" is a writ issued by the clerk of a court, or other authorized person, in a criminal action commanding some peace officer to bring the witness to court to testify for either the State or the defendant. TEX. CODE CRIM. PROC. ANN. art. 24.11. Article 24.12 of the Code of

21

Criminal Procedure provides the authority for issuance of writs and sets forth the requirements for how a request for such writ must be made:

> When a witness who resides in the county of the prosecution has been duly served with a subpoena to appear and testify in any criminal action or proceeding fails to so appear, the attorney representing the state or the defendant may request that the court issue an attachment for the witness. The request must be filed with the clerk of the court and must include an affidavit of the attorney representing the state or the defendant, as applicable, stating that the affiant has good reason to believe, and does believe, that the witness is a material witness.

TEX. CODE CRIM. PROC. ANN. art. 24.12. If issuance of an attachment is requested for a witness younger than 18 years, the request must likewise include the applicable affidavit from the requesting party described by article 24.12. TEX. CODE CRIM. PROC. ANN. art. 24.011(a), (b-1).

As stated earlier, effective September 1, 2017, article 24.111 of the Code of Criminal Procedure, was amended to require a hearing be held before issuance of a writ of attachment. Act of April 5, 2017, 85th Leg., R.S., ch. 292, § 3, 2017 Tex. Gen. Laws 541, 542 (codified at TEX. CODE CRIM. PROC. ANN. art. 24.111). As amended, a writ of attachment may only be issued by the judge of the court in which the witness is to testify if the judge determines, after a hearing, that the issuance of the attachment is in the best interest of justice. TEX. CODE CRIM. PROC. ANN. art. 24.111(b). In making this determination, the judge shall consider the affidavit of the attorney representing the state or the defendant, as applicable, that was submitted with the request for issuance of the attachment. TEX. CODE CRIM. PROC. ANN. art. 24.111(c). Lastly, the court *shall* appoint an attorney to represent the witness at the hearing under subsection (b), to include representing the witness at a hearing conducted outside the presence of the witness. TEX. CODE CRIM. PROC. ANN. art. 24.111(d).

*Article 38.23 Standing*

Texas Code of Criminal Procedure article 38.23 provides that no evidence obtained by an officer or other person in violation of the laws or Constitutions of Texas or the United States shall be admitted in evidence against the accused on the trial of any criminal case. TEX. CODE CRIM. PROC. ANN. art. 38.23(a). The purposes underlying both the federal exclusionary rule and article 38.23 are the same: to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement. *Wilson v. State*, 311 S.W.3d 452, 459 (Tex. Crim. App. 2010).

In a series of early opinions, the Court of Criminal Appeals affirmed the principle that the right to complain because of an illegal search and seizure is a privilege personal to the wronged or the injured party and is not available to anyone else. *Fuller v. State*, 829 S.W.2d 191, 202 (Tex. Crim. App. 1992), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993). A defendant therefore has no standing to complain about evidence seized in violation of Texas law unless the defendant's rights were invaded by the seizure. *Chavez v. State*, 9 S.W.3d 817, 819 (Tex. Crim. App. 2000); *Fuller*, 829 S.W.2d at 201-02; *Cazares v. State*, No. 08-15-00266-CR, 2017 WL 3498483, at *13 (Tex. App. – El Paso Aug. 16, 2017, pet. ref'd) (not designated for publication); *see also State v. Huse*, 491 S.W.3d 833, 839 (Tex. Crim. App. 2016) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."); *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008) ("A defendant has no standing to raise a constitutional challenge to another person's confession.").

In *Chavez v. State*, the case involved a situation in which a police officer—who was authorized by an agreement between several counties to investigate controlled-substance

23

violations in the participating counties—made an undercover buy of cocaine from Chavez in a county that was not a party to the agreement. *Chavez*, 9 S.W.3d at 818. The Court of Criminal Appeals emphasized that Chavez claimed the cocaine should have been suppressed "*solely* because [the officer] obtained it from her outside the geographical boundaries set out in the Agreement. [Chavez] alleged no violation of any of *her* rights." *Id*. The Court rejected Chavez's argument and held that only the parties to the agreement had standing to complain about the breach of the agreement. *Id*. at 819.

In *Fuller v. State*, the Court of Criminal Appeals similarly held that article 38.23 did not require suppression of an incriminating audiotape that Fuller had given to a fellow inmate, that was stolen by a third inmate, and that was given by the third inmate to prison officials. *Fuller*, 829 S.W.2d at 201-02. The Court held that the theft of the tape by the third inmate from the second inmate did not violate any of Fuller's rights. *Id*. at 202. Fuller thus did not have standing to complain about the theft, and article 38.23 did not require the tape's exclusion. *Id*.

*Application*

Here, although the State concedes that newly applicable procedures were not followed which are directed at protecting witnesses from being attached absent a showing of materiality, Fernandez asserts a complaint on appeal based not on a violation of his own rights but on the alleged violation of the rights of another, namely, the right of witness Flores to be free of a seizure that was non-compliant with statutory authority. We view this situation as being analogous to those addressed in *Chavez* and *Fuller* where the Court of Criminal Appeals rejected complaints regarding violations of rights not belonging to the defendants, and thus, the Court reaffirmed the longstanding principle that a defendant does not have standing to assert the rights of a third party.

24

*See Chavez*, 9 S.W.3d at 819; *Fuller*, 829 S.W.2d at 202.

On review, we conclude that Fernandez made no showing at trial of an invasion of his own rights to establish he had standing to complain of the State's use of the writ of attachment to secure the attendance for trial of complaining witness Flores. He likewise offered no explanation as to how such an invasion of his rights could have occurred under these circumstances. Due to his failure to establish any violation of his own personal rights, we hold that he does not have standing to challenge the propriety of the trial court's issuance of the writ of attachment here. *See, e.g., Chavez*, 9 S.W.3d at 819; *Fuller*, 829 S.W.2d at 201-02; *see also Blue v. State*, Nos. 02-17-00265-CR, No. 02-17-00266-CR, No. 02-17-00267-CR, 2018 WL 6844134, at *10-11 (Tex. App. – Fort Worth Dec. 31, 2018, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that fruits of a grand jury subpoena for insurance-claim records should have been suppressed where, even assuming the documents were obtained in violation of Texas law, the State did not subpoena information from the defendant and, rather, subpoenaed the documents from the insurance companies of two other individuals and thus holding there was no invasion of the defendant's rights to establish standing); *cf. Chavis v. State*, No. 08-10-00026-CR, 2011 WL 3807788, at *5 (Tex. App. – El Paso Aug. 26, 2011, pet. ref'd) (not designated for publication) (holding that the defendant did not have standing to challenge whether the proper procedures were followed to give a grand jury the power to issue a subpoena where the defendant did not have a reasonable expectation of privacy in the information sought through the subpoena).

Even though newly enacted procedures were not complied with in this instance, we note that the record here shows that as soon as Flores arrived in court she was allowed to meet with her own attorney who requested afterward that she be granted permission to further represent Flores

in regard to her appearance at trial. The trial court made the appointment and allowed Flores'

attorney to advocate for her and to remain present throughout her testimony for her sole benefit.

No objections were raised at any time about the lack of materiality of Flores' testimony nor her

detention pursuant to the writ's issuance, by either Flores herself, by means of her appointed

counsel, or by Fernandez. On this record, we conclude that Fernandez wholly failed to establish

how his own rights were violated in this instance. We thus conclude that Fernandez has not shown

he had any standing to complain of the lack of a hearing on the State's initial request for a writ of

attachment against Flores nor of the trial court's issuance of said writ. We therefore overrule

Fernandez' second issue presented for review.

### *Issue 3: Whether the Trial Court Erred in Admitting the Extraneous Offense Evidence*

In his third issue presented for review, Fernandez argues in a two-part complaint that the

trial court erred in admitting testimony from A.F. during the guilt phase of trial that included

extraneous offenses by Fernandez against Flores. First, he argues that the complained-of evidence

was inadmissible because it had no relevance apart from character conformity. Second, he argues

that the evidence was inadmissible due to the insufficient notice he was given of the State's intent

to introduce newly-revealed evidence in the guilt phase of trial.[11] Fernandez argues that both errors

were harmful and require reversal.

Regarding the first part of Fernandez' complaint, the State responds that the complained-

of evidence had relevance apart from character conformity and was admissible because: (1) it

rebutted his defensive theories that he and Flores had a good relationship, that her mental-health

---

[11] In this sub-part of his issue, Fernandez' complaint relates only to the unreasonable timing of the State's notice and not to any unreasonableness in the specificity of acts given in the notice.

issues were responsible for the discord in their relationship, and that she fabricated the allegations against him; and (2) it assisted the jury in understanding the nature of the relationship between Fernandez and Flores by shedding light on the reasons for Flores' recantation. Regarding the second part of Fernandez' complaint, the State responds that notice of its intent to admit the evidence was not deficient because: (1) the evidence qualified as rebuttal evidence and the State therefore was not required to give advance notice of it; and (2) even if the evidence did not so qualify, the State gave reasonable notice where it notified him immediately upon its discovery. Additionally, the State responds that admission of the evidence, if error, was nonetheless harmless.

We ultimately hold that the extraneous-offense evidence was admissible for non-character-conformity purposes under article 38.371 of the Code of Criminal Procedure and that, assuming the State's notice of intent to admit it was deficient, the admission of the evidence even with deficient notice was harmless. Therefore, we need not address the State's alternative arguments addressing Fernandez' third issue.

*Standard of Review*

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). As long as the trial court's ruling is within the zone of reasonable disagreement, we will uphold the ruling. *Id*. at 343-44. Furthermore, we will uphold the trial court's ruling if it is correct on any theory of law applicable to the case. *Id*. at 344.

**Part 1: Relevancy of Extraneous-offense Evidence**

*Article 38.371*

Generally, extraneous-offense evidence is not admissible at the guilt phase of trial to prove

27

that a defendant committed the charged offense in conformity with his own bad character. TEX. R. EVID. 404(b)(1); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). But extraneous-offense evidence may be admissible when it has relevance apart from character conformity. TEX. R. EVID. 404(b)(2); *Devoe*, 354 S.W.3d at 469; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Article 38.371 of the Code of Criminal Procedure provides an avenue for the admissibility of "all relevant facts and circumstances" that would assist the trier of fact in determining whether a defendant committed certain family-violence-related offenses as follows:

> (b) In the prosecution of an offense described by Subsection (a), subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.
>
> (c) This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. ANN. art. 38.371(b), (c). Areas of relevant and admissible extraneous-offense evidence that complies with article 38.371 include evidence that: (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution; (2) confirms the victim's initial—and later recanted—statements to police; or (3) contextualizes the nature of the relationship between victim and assailant. *See, e.g., Gonzalez v. State*, 541 S.W.3d 306, 312 (Tex. App. – Houston [14th Dist.] 2017, no pet.); *Williams v. State*, No. 02-18-00382-CR, 2019 WL 2223214, at *3 (Tex. App. – Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication).

*Application*

As previously observed, while Flores testified about her relationship with Fernandez, she

28

recanted allegations she had made against Fernandez. She also acknowledged she had received a subpoena for herself and for A.F. but she did not respond to either one. Flores' testimony thus made the extraneous-offense evidence relevant to explain why she was unwilling to cooperate with the prosecution at trial, to confirm her initial story to police, and to contextualize the nature of her relationship with Fernandez. *See Gonzalez*, 541 S.W.3d at 310-12; *Williams*, 2019 WL 2223214, at *3. Even if Flores' testimony had not placed these three areas of subject matter squarely within the realm of relevance, article 38.371 shows on its face a legislative determination that "testimony or evidence regarding the nature of the relationship between the actor and the alleged victim" is automatically one of the contemplated and non-exhaustive "relevant facts and circumstances" under the article. *See, e.g., Exezidis v. State*, No. 14-17-00087-CR, 2018 WL 1278503, at *6 (Tex. App. – Houston [14th Dist.] Mar. 13, 2018, pet. ref'd) (mem. op., not designated for publication) (observing that the plain language of article 38.371 makes evidence regarding the nature of the relationship between the actor and the alleged victim relevant and thus the court reasons that "[h]ad counsel objected on relevance grounds, the trial court may have determined that [the victim's] testimony was relevant to the nature of the couple's relationship and, therefore, admissible"); *Bunton v. State*, No. 05-17-01244-CR, 2018 WL 6695732, at *4 (Tex. App. – Dallas Dec. 20, 2018, no pet.) (mem. op., not designated for publication) (holding the same); *Hammond v. State*, No. 10-17-00178-CR, 2018 WL 1866053, at *2 (Tex. App. – Waco Apr. 18, 2018, no pet.) (mem. op., not designated for publication) (same).

We thus uphold the trial court's decision to admit the extraneous-offense evidence because it was admissible under article 38.371 of the Code of Criminal Procedure. We overrule this first part of Fernandez' third issue, but we must next address whether the State's notice of intent to

introduce the evidence was unreasonable and was harmful error.

## Part 2: Notice Requirement for Admissibility of Extraneous Offenses

*"Reasonable Notice" and Harm Analysis for Insufficient Notice of Extraneous-offense Evidence*

The notice provision of Rule 404(b) provides, in relevant part, that extraneous-offense evidence may be admissible for limited, non-character conformity purposes provided that, upon timely request by the accused, the prosecution gives the accused reasonable notice in advance of trial of its intent to use such evidence during its case-in-chief. TEX. R. EVID. 404(b); *see also Hernandez v. State*, 176 S.W.3d 821, 822 (Tex. Crim. App. 2005). The purpose of the notice requirement is to avoid unfair surprise to the defendant and to enable him to prepare to answer the extraneous misconduct evidence. *See Hernandez*, 176 S.W.3d at 825; *Apolinar v. State*, 106 S.W.3d 407, 414 (Tex. App. – Houston [1st Dist.] 2003), *aff'd*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 281-82 (Tex. App. – Austin 2002, no pet.).

However, the admission of an extraneous offense into evidence when the State failed to provide reasonable notice as required by statute is non-constitutional error. *See McDonald v. State*, 179 S.W.3d 571, 578 (Tex. Crim. App. 2005); *Hernandez*, 176 S.W.3d at 824. An appellate court may reverse a judgment based on non-constitutional error only if that error affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b).

To determine harm in light of the purpose of the extraneous-offense notice requirement, we must analyze whether and how the notice deficiency affected the defendant's ability to prepare for the evidence. *See Hernandez*, 176 S.W.3d at 825; *McDonald*, 179 S.W.3d at 578; *Apolinar*, 106 S.W.3d at 414; *Roethel*, 80 S.W.3d at 282. Because there is no contention of prosecutorial bad faith here, we examine the record to determine whether the deficient notice prevented the

30

defendant from preparing for trial. *See Apolinar*, 106 S.W.3d at 414; *Roethel*, 80 S.W.3d at 282. In determining the impact on trial preparation, we look at whether the defendant was surprised by the substance of the testimony and whether that surprise affected his ability to prepare cross-examination or to mitigate against evidence admitted against him. *Apolinar*, 106 S.W.3d at 414-15; *Roethel*, 80 S.W.3d at 282. A defendant may demonstrate surprise by showing how his defense strategy might have been different had the State explicitly notified him that it intended to offer the extraneous-offense evidence at trial. *See Hernandez*, 176 S.W.3d at 826; *Allen v. State*, 202 S.W.3d 364, 369 (Tex. App. – Fort Worth 2006, pet. ref'd). Error in admitting evidence in violation of a notice requirement does not have an "injurious" effect on the verdict if the defendant was not surprised by the admission of the evidence. *See Hernandez*, 176 S.W.3d at 825; *Roethel*, 80 S.W.3d at 282.

If the trial court affords a defendant a continuance or recess to mitigate unreasonable notice given by the State regarding an extraneous act, the unreasonable notice can be rendered harmless where the defendant fails to request any additional time to address the newly-revealed extraneous act or to make an objection based on having a potentially different defensive theory foreclosed by an already-undertaken trial strategy. *See, e.g.*, *Francis v. State*, 445 S.W.3d 307, 317 (Tex. App. – Houston [1st Dist.] 2013), *aff'd*, 428 S.W.3d 850 (Tex. Crim. App. 2014); *Webb v. State*, 36 S.W.3d 164, 183 (Tex. App. – Houston [14th Dist.] 2000, pet. ref'd); *Zubia v. State*, No. 08-09-00309-CR, 2012 WL 225470, at *9 (Tex. App. – El Paso Jan. 25, 2012, pet. ref'd) (not designated for publication) (cases holding that the defendant was not harmed by insufficient notice where the defendant did not request a continuance or additional time to prepare for the newly-revealed evidence and where the record did not reflect that the defendant had a different defensive theory

to present had he known of the existence of the evidence at an earlier time); *c.f. In Matter of E.O.E.*, 508 S.W.3d 613, 624-25 (Tex. App. – El Paso 2016, no pet.) (overruling defendant's claim that the State's mid-trial disclosure of *Brady* evidence favorable to him undermined confidence in the verdict where he did not request a continuance when given the opportunity to do so).

*Application*

Even assuming that the State's notice of intent to introduce the extraneous-offense evidence was unreasonable, we find that its admission was harmless. Once the State informed Fernandez of its intent to introduce extraneous-offense evidence that it had newly gained knowledge from A.F., Fernandez objected because the timing of the State's disclosure was unbelievably disadvantageous, caught him by utter surprise, and would not give him adequate opportunity to prepare a defense against the evidence. The trial court then brought A.F. into the courtroom so that both sides would have an opportunity to explore the content of her potential testimony outside the presence of the jury. After the State elicited testimony from A.F. about multiple extraneous acts, Fernandez took his opportunity to cross-examine her. As it was a Friday, the court then afforded Fernandez an early recess until Monday morning with the consent of the State. When trial resumed on Monday and A.F. took the stand to testify, Fernandez neither requested additional time to prepare a defense to the extraneous offenses nor made an objection that his defensive theory was hamstrung at that point in time by the State's late disclosure.

On review, we conclude that the record in this case demonstrates sufficient mitigating circumstances allowing us to say with confidence that, by the time A.F. testified, the State's unreasonable notice did not have an injurious effect on the verdict. Our conclusion finds support in the fact that Fernandez made no objection after the trial had resumed from an early recess before

32

the weekend when such early recess was given to allow him time to digest the newly revealed extraneous-offense information acquired by the State from its recent interview of A.F. *See, e.g.*, *Francis*, 445 S.W.3d at 317; *Webb*, 36 S.W.3d at 183; *Zubia*, 2012 WL 225470, at *9; *c.f. In Matter of E.O.E.*, 508 S.W.3d at 624-25. Furthermore, the trial court's decision to allow both parties to examine A.F. outside the presence of the jury and before the recess militates against a conclusion that Fernandez was unable to prepare for the extraneous-offense evidence. *See Self v. State*, 860 S.W.2d 261, 264 (Tex. App. – Fort Worth 1993, pet. ref'd) (that the defendant was not surprised by the extraneous-offense testimony where the trial court afforded defense counsel an opportunity to cross-examine the extraneous-offense witness outside the presence of the jury). Any surprise was further mitigated by the State's pre-trial notices that gave Fernandez general notice that the State might introduce various unreported bad acts committed by him to show his "[c]ontinuous physical, verbal and emotional abuse; [against] victim [Flores][.]" *See Apolinar*, 106 S.W.3d at 414-15; *Roethel*, 80 S.W.3d at 282 (in determining harm, a reviewing Court must look to whether the defendant was surprised by the substance of the testimony).

Based on all the circumstances present here, we hold that the State's deficient notice did not affect Fernandez' substantial rights and did not amount to harmful error requiring reversal of his conviction. *See* TEX. R. APP. P. 44.2(b); *McDonald*, 179 S.W.3d at 578; *Hernandez*, 176 S.W.3d at 824. Therefore, we overrule the second part of his third issue presented for review.

### *Issue 4: Whether the Trial Court Erred in Finding that Juror Garcia was Disabled*

In his fourth issue presented for review, Fernandez argues in another two-part complaint that the trial court abused its discretion in finding that Juror Garcia was disabled under article 36.29 of the Code of Criminal Procedure because, as Fernandez asserts, he was not given the opportunity

33

to question Juror Garcia or other relevant witnesses before the trial court made its ruling and because no testimony from Juror Garcia or the first responders who tended to him was put on the record. The State first responds that Fernandez waived this issue by failing to request a hearing regarding Juror Garcia's disability. Even if Fernandez did not waive his issue for appellate review, the State additionally argues that the trial court's recitation of the factual underpinnings of its ruling supply the necessary record support for the ruling. We hold that Fernandez waived the first part of his complaint about not having been afforded an opportunity to question witnesses on the disability issue, and even after considering whether the trial court's ultimate disability determination was error, we hold that the trial court's ruling is supported by the record.

*Standard of Review*

The trial court's disability determination is reviewed for an abuse of discretion. *Scales v. State*, 380 S.W.3d 780, 784 (Tex. Crim. App. 2012). In making its determination, the trial court is the sole fact finder and judge of the credibility of the evidence. *See id.*

*Article 36.29*

Article 36.29 provides that not less than twelve jurors can render and return a verdict in a felony case. TEX. CODE CRIM. PROC. ANN. art. 36.29(a). However, an express exception to this provision gives the remainder of the jury the power to render a verdict where, after the trial of any felony case begins and before the charge of the court is read to the jury, the trial court determines that a juror has become disabled from sitting, and in such case, when a verdict is rendered by less than the whole number, it shall be signed by every member of the jury concurring in it. *Id.* The Court of Criminal Appeals has interpreted article 36.29 to require that a disabled juror suffer from a physical illness, mental condition, or emotional state that would hinder or inhibit the juror from

34

performing his duties as a juror or that the juror was suffering from a condition that inhibited him from fully and fairly performing the functions of a juror. *Scales*, 380 S.W.3d at 783.

Although the record must show the basis of the trial court's determination on disability, there is no requirement that the trial court have the potentially disabled juror testify on the record regarding their disability. *See Scales*, 380 S.W.3d at 784 (recognizing that testimony from the dismissed juror was not required and that the trial court's decision was not based on a silent record where the record reflected exchanges between the trial court and a witness to the juror's potential disability); *Engledow v. State*, Nos. 03-04-00765-CR, 03-04-00768-CR, 2006 WL 357890, at *2 (Tex. App. – Austin Feb. 16, 2006, no pet.) (mem. op., not designated for publication) ("Although there must be some showing of disability, the legal standard by which a trial court determines that a juror has become disabled does not require that the trial court obtain a particular type of proof of the disability."). The burden is on the complaining party to develop a sufficient record in the trial court to show the nature and source of any error on appeal regarding a trial court's ruling on juror disability. *Rivera v. State*, No. 08-05-00339-CR, 2007 WL 766129, at *3 (Tex. App. – El Paso Mar. 15, 2007, no pet.) (not designated for publication) (citing *Ortiz v. State*, 144 S.W.3d 225, 230 (Tex. App. – Houston [14th Dist.] 2004, pet. ref'd)).

### Part 1: Lack of a Hearing Before Finding of Juror Disability

In this case, Fernandez objected to the trial court's finding that Juror Garcia was disabled on the basis that the finding may have been "premature" and did not comply with article 36.29 of the Code of Criminal Procedure. Although the trial court indicated that Juror Garcia was still in the courthouse waiting for his driver to arrive, Fernandez did not ask for a hearing to elicit live testimony from any witnesses, and he did not object on that basis, even when given the opportunity

35

to do so after he was interrupted by the court.

However, to preserve error for appellate review, the Texas Rules of Appellate Procedure require that the record show the objection "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context[.]"  TEX. R. APP. P. 33.1(a)(1)(A); *see also Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).  The point of error on appeal must comport with the objection made at trial.  *Clark*, 365 S.W.3d at 339.  And although Fernandez made a clear objection regarding the requisites of article 36.29, he never made the complaint he now makes on appeal regarding the lack of a hearing for live witness testimony on the issue of Juror Garcia's disability.  We hold that this part of his fourth issue is waived because his objection at trial does not comport with his complaint on appeal, and thus we overrule it.  *See Clark*, 365 S.W.3d at 339; *cf. Rivera*, 2007 WL 766129, at *2 (holding that defendant's newly-raised appellate complaint concerning juror disability was waived where it did not comport with the basis of his argument raised in the trial court).

### Part 2: Finding of Juror Disability under Article 36.29

Juror Garcia first alerted the trial court to his physical illness when he interrupted opening statements and expressed that he was "feeling a little sick."  To no avail, the trial court afforded Juror Garcia multiple recesses in order to see if his condition would improve.  Before excusing Juror Garcia for being disabled, the trial court informed both parties on the record of the following developments regarding Juror Garcia's condition: (1) Juror Garcia said he had gotten lightheaded and felt as though he was going to faint; (2) emergency medical services was called upon to check his vitals; (3) although he did not want to leave, he felt "shaky, nervousness and wanting to faint";

36

(4) he did not feel better even after having something to eat and having his vitals checked; and (5) he was in such an ill state that he did not feel he could drive himself from the courthouse. Based on this record support, we hold that the trial court acted within its discretion to determine that Juror Garcia was disabled due to a physical illness that would inhibit him from fully and fairly performing the functions of a juror. *See Scales*, 380 S.W.3d at 783-84.

In his attempt to show an abuse of discretion here, Fernandez points to the lack of record support that is based on actual testimony from Juror Garcia himself or from the first responders who tended to him and his condition. However, there is no requirement that the disabled juror testify on the record. *See Scales*, 380 S.W.3d at 784; *Engledow*, 2006 WL 357890, at \*2. Neither is there any requirement that the trial court's recitations on the record be corroborated by an independent source of evidence. *See Dacus v. State*, No. 08-08-00026-CR, 2010 WL 546691, at \*3 (Tex. App. – El Paso Feb. 17, 2010, pet. ref'd) (not designated for publication) (rejecting defendant's contention that there must be independent corroboration from a doctor showing the juror's medical disability and instead recognizing the absence of any such additional requirements before the trial court may discharge a juror for a disability). The burden remained on Fernandez to develop a sufficient record to demonstrate error on appeal regarding the trial court's ruling on juror disability. *Rivera*, 2007 WL 766129, at \*3. He has failed to do so here, and we must reject his contentions and overrule this second part of his fourth issue on appeal, as well. *See Rivera*, 2007 WL 766129, at \*3 (rejecting the defendant's contention that the trial court "failed to create a record that on appeal could have allowed the appellate Court to review a finding regarding juror disability" because the burden was on the defendant to develop a sufficient record to show the nature and source of his complained-of error).

## CONCLUSION

For all the reasons stated, we conclude that the trial court's judgment is affirmed.


GINA M. PALAFOX, Justice

February 20, 2020

Before Alley, C.J., Rodriguez, and Palafox, JJ.

(Publish)